IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NICHOLAS COX,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | ) Case No. 22-CV-3154-SAC |
| | ) |
| **JEFF ZMUDA,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**REPORT IN "MARTINEZ VS AARON" INVESTIGATION
CIVIL RIGHTS COMPLAINT**

On July 28, 2022, Plaintiff Nicholas Cox filed a *pro se* civil rights action pursuant to 42 U.S.C. §1983 in the United States District Court for the District of Kansas. (Doc. 1). At all relevant times, Plaintiff was a resident incarcerated in the custody of the Secretary of Corrections and was housed at the El Dorado Correctional Facility (EDCF). On September 14, 2022, the Court issued an order directing the preparation of a *Martinez* report. (Doc. 13).

**SUMMARY OF ALLEGATIONS IN PLAINTIFF'S COMPLAINT**

Plaintiff alleges that he was subjected to cruel and unusual punishment and denied equal protection (Doc. 11, pp. 2).

Plaintiff requests $75,000.00 in compensatory damages, unspecified punitive damages, and transfer to general population in a medium security facility. (Doc. 11, p. 6).

According to his complaint, Plaintiff was in Segregation on Other Security Risk (OSR) status for a year at EDCF. (Doc. 11, p. 3). Upon his release to general population, he states that

he was immediately attacked by another resident and placed on Holdover Transfer Status and told that it was not safe to house him at EDCF. (Doc. 11, p. 3). Plaintiff states that he remained on Holdover status for sixteen months, and as a result of spending a total of twenty-eight (28) months in Segregation without steady yard, he developed a blood clot. (Doc. 11, p. 3). Plaintiff alleges that efforts to procure a transfer failed, and because he was not being allowed yard or exercise in Segregation at the time, he elected to move to general population. (Doc. 11, p. 3). He states that he was immediately attacked and returned to Holdover Status, where he remained at the time of filing the Complaint. (Doc. 11, p. 3).

Plaintiff states that he had been in Segregation for over 1200 days, of which 800 were on Holdover Transfer status, and the denial of exercise was off-and-on throughout the 800 days. (Doc. 11, p. 3). He states that he was allowed no yard from August, 2021 to May, 2022, and one day per week at the time of filing. (Doc. 11, p. 3). He alleges that he was told the denial of yard from August, 2021, to May, 2022, was due to staffing levels. (Doc. 11, p. 3). He states that he was double-bunked in a closet-sized cell with no time out of the cell, apart from three showers per week. (Doc. 11, p. 3). He states that lack of out-of-cell exercise has caused him to suffer depression, weight gain, and DVT blood clots. (Doc. 11, p. 3).

Plaintiff also states that the length of time he has spent on Holdover Status is not that of a typical Holdover status inmate, and the denial of yard is a significant and atypical hardship compared to a typical Holdover Status inmate. (Doc. 11, p. 4). He alleges that Defendants could have transferred him out-of-state in May 2020, but they did not submit him for Interstate Compact transfer until February 2022. (Doc. 11, p. 4). Plaintiff argues that Internal Management Policy and Procedure (IMPP) 20-101A provides that each resident confined in restrictive housing is to be allowed to exercise outside the cell for at least one hour per day and at least five days per week,

unless circumstances such as emergency or extreme weather make such exercise periods impractical or dangerous. (Doc. 11, p. 4). He further cites a provision of the IMPP stating that Restrictive Housing residents are to be permitted to exercise outdoors for four of the five days, to the extent that facilities and staff are available to maintain basic security for those residents. (Doc. 11, p. 4). Plaintiff asserts that Holdover inmates are normally provided yard in accordance with the policy, but he was not. (Doc. 11, p. 4).

## **INVESTIGATION**

Plaintiff's current incarceration began on June 24, 2014, at the EDCF. (Exhibit 1, p. 1). Between August 25, 2014, and April 4, 2019, he was transferred to Hutchinson Correctional Facility (HCF), Lansing Correctional Facility (LCF), and Larned Correctional Mental Health Facility (LCMHF), before returning to EDCF, where he continues to be housed at the time of this investigation.

### *GRIEVANCES*

On or about September 11, 2020, Plaintiff submitted a grievance, alleging that he had been waiting four months for transfer, and he believed that the holdover process was used as a toll to systematically keep people in long-term segregation. The Unit Team responded that the grievance procedure was not to be used as a substitute for, or as a part of, the classification decision-making process. The Warden's response on September 18, 2020, stated the same, as did the Secretary's response on September 25, 2020. (Exhibit 6).

On or about May 11, 2021, Plaintiff submitted grievance no. CA22248, wherein he complained he had been on Holdover Transfer status for over a year, causing him to be diagnosed with alopecia and a serious blood clot. (Exhibit 6).

On or about March 11, 2022, Plaintiff submitted a grievance form, stating that he had been attacked in May of 2020, and remained in Holdover status awaiting transfer. He alleged the Deputy Warden Call had told him he would be given medium-by-exception security classification and transferred to Ellsworth Correctional Facility, but the plan had been canceled. Plaintiff stated that he had been lied to and that he should be given a custody exception. The Unit Team response explained that resident placement is a classification issue and is not part of the grievance procedure pursuant to K.A.R. 44-15-101a. Plaintiff was advised to contact the Classification Administrator. The response was approved by the Warden on March 25, 2022, and by the Secretary's designee on April 6, 2022. (Exhibit 6).

On or about March 23, 2022, Plaintiff submitted a grievance appeal directly to the Secretary of Corrections, complaining that he had been in segregation for 1100 days on holdover transfer status, and he believed he should be transferred without delay to a general population somewhere other than Lansing, El Dorado, or Hutchinson, and he stated that he had not been afforded outside yard in over six months. The grievance was treated as an emergency grievance, pursuant to K.A.R. 44-15-106. On March 29, 2022, the Secretary's Designee responded that the matters raised did not constitute an emergency, and the grievance would be forwarded to the Warden for review and response as a regular grievance. (Exhibit 6).

On or about May 4, 2022, Plaintiff submitted grievance CA22639, stating that he had not gotten yard/outside yard for over seven months, and that it had been sporadic during the preceding three years. He stated that this had caused him health problems, included a blood clot and weight gain, but he was able to beat his blood clot, because he was afforded a period of a single-man cell, which allowed him to exercise. He requested restoration of lost good-time to redress his grievance.

The Unit Team response was approved by the Warden on May 20, 2022, and by the Secretary's designee on June 1, 2022.  (Exhibit 6).

On or about October 15, 2022, Plaintiff submitted grievance CA22723, stating that he was in restricted housing against medical policies and that his extended stay in restricted housing was exacerbating his symptoms.  He requested restoration of lost good-time to redress his grievance. RN Lindzie Mendoza responded to his grievance noting that there are no mental health reasons why he cannot be housed in restricted housing, and that he should take all of his prescribed medications given at a prior medical visit he admitted to refusing to take his medications to "make KDOC take notice." The RN response was approved by the Warden on November 23, 2022, and by the Secretary's designee on December 12, 2022.  (Exhibit 6).

On or about September 14, 2022, Plaintiff submitted a series of grievances numbered CA22733, stating that he was in constant pain due to the blood clots caused by his stay in restricted housing and that medical staff should advocate for a transfer.  He stated that he had been unable to review the results of his sonogram and wanted medical staff to document the reason for his blood clots.  He again requested restoration of lost good-time to redress his grievance.  RN Sarah Madgwick responded to his grievance noting his diagnosis and treatment and that he was being provided appropriate care and treatment. The RN response was approved by the Warden on November 23, 2022, and by the Secretary's designee on December 12, 2022.  (Exhibit 6).

### *MEDICAL RECORDS*

On February 3, 2021, Mr. Cox saw a provider after reporting pain in his lower right leg. Mr. Cox reported that this pain had lasted for a week. He also reported a family history of blood clots, but denied any family or personal history of bleeding or clotting disorders. The provider

5

observed no swelling noted and good circulation in his toes. Mr. Cox was educated about potential conditions, advised to attempt to do exercise in his cell, and advised to request sick call if the pain persisted or became worse. (Madgwick Affidavit, attached hereto as Exhibit 5, ¶ 8).

On February 5, 2021, Mr. Cox was seen in the cell house clinic for continued pain. He had no noted history of blood clots at the time but was admitted to the infirmary for observation, and had labs drawn. (Madgwick Affidavit, ¶ 9).

On February 8, 2021, an onsite ultrasound of Mr. Cox's lower right leg was recommended. This was performed on February 10, 2021, and found a "proximal DVT of right leg." Mr. Cox was placed on Xarelto, a blood thinning medication, to treat this condition for an initial 60-day prescription. (Madgwick Affidavit, ¶ 10).

On February 14, 2021, Mr. Cox refused nurse sick call to address pain and swelling in his leg, stating "I don't want to come to NSC." (Madgwick Affidavit, ¶ 11).

On March 18, 2021, Mr. Cox was seen by a provider for chronic care. He was given instructions on exercises to utilize in his cell. (Madgwick Affidavit, ¶ 12).

On April 19, 2021, a provider followed up at the close of Mr. Cox's 60-day Xarelto medication, ordering a follow-up ultrasound in mid-June to confirm that the DVT had resolved. The provider also started him on an aspirin regime. (Madgwick Affidavit, ¶ 13).

On June 11, 2021, the scheduled follow-up ultrasound found that Mr. Cox still had a right popliteal and infrapopliteal DVT. He was restarted on Xarelto for an additional 30 days. On July 13, 2021, this prescription was renewed for an additional 30 days. (Madgwick Affidavit, ¶ 14).

On August 16, 2021, Mr. Cox had a nurse visit where he stated "I made a mistake. this blood clot/dvt has been going on much longer than i said it has been for over a year now sometimes better and sometimes worse. i am worried about permanent damage to the vein." This reported timeframe was different from his initial report in February that he had only experienced the issue for a week. A provider saw Mr. Cox the next day, increased his Xarelto prescription from 15 mg/day to 20 mg/day, and recommended an outside appointment with a vascular surgeon. (Madgwick Affidavit, ¶ 15).

On September 2, 9, and 10, 2021, Mr. Cox was seen by providers regarding numbness in his leg right leg, and on September 13, 2021, the outside consult with a vascular surgeon was approved. The first vascular surgeon was unable to see Mr. Cox until October. On September 15, 2021, Centurion staff rescheduled Mr. Cox with another provider who could see him two days later on September 17, 2021. (Madgwick Affidavit, ¶ 16).

On September 17, 2021, Mr. Cox visited Dr. Ryan Beard, a cardiology specialist. Dr. Beard recommended that Mr. Cox continue Xarelto for 12 months, and to consider a hypercoagulation work up. Dr. Beard described the condition as "unexplained DVT." (Madgwick Affidavit, ¶ 17).

From November 19 to 24, 2021, Mr. Cox was transported to Johnson County, Kansas for a court appearance. (Madgwick Affidavit, ¶ 18).

On January 26, 2022, an outpatient request was submitted for the recommended 5-month cardiology follow-up. On February 15, 2022, Mr. Cox's ultrasound follow-up returned negative for any clots. On February 16, 2022, Mr. Cox stated that he thought his problems may be diabetes-related, and requested a diabetes test, which was scheduled. On February 21, 2022, Mr. Cox refused the cardiology follow-up because he believed it was holding up his transfer to another

facility. His anticoagulants were also stopped at this time. On February 23, 2022, Mr. Cox also refused a lab draw of blood. (Madgwick Affidavit, ¶ 19).

On March 21, 2022, Mr. Cox again reported pain in his right lower leg; the nurse staff referred him to see a provider. The next day, Mr. Cox was seen by a provider who instructed him on increasing movement as possible. (Madgwick Affidavit, ¶ 20).

On July 7, 2022, Mr. Cox reported that his blood clot was back. Upon evaluation by a nurse, he was scheduled for urgent/emergent sick call with a provider, who he saw the same day. That provider ordered injections of Lovenox for three days (six times total, once every 12 hours), an anticoagulant that helps prevent blood clots. He was then taken to Susan B. Anthony Memorial Hospital for an emergent ultrasound. After this course of Lovenox, oral Xarelto was restarted. (Madgwick Affidavit, ¶ 21).

On July 19, 2022, Mr. Cox refused a chronic care appointment. On July 20, 2022, Mr. Cox refused a re-draw of a lab sample, which was needed due to the previous sample having been out of stability upon delivery to the lab. Mr. Cox continued to refuse other treatment, including: an ultrasound on July 25, 2022; a lab draw on August 11, 2022; nurse sick calls on August 14, 2022 and September 5, 2022; and a doctor sick call on October 14, 2022, despite stating that he wanted to speak to a provider about stopping his medication. On August 23, 2022, Mr. Cox requested and was placed on a cardiac diet. (Madgwick Affidavit, ¶ 22).

On October 18, 2022, Mr. Cox affirmed that he stopped taking his Xarelto but reported that his "clots got hot and painful." (Madgwick Affidavit, ¶ 23).

On October 19, 2022, Mr. Cox was seen by a provider and a handheld ultrasound revealed no evidence of blood clots. Mr. Cox was again educated about exercises to stretch leg muscles and engage in movement in his cell. He agreed to resume Xarelto. (Madgwick Affidavit, ¶ 24).

On October 28, 2022, Mr. Cox was seen by a provider for a chronic care appointment. On November 17, 2022, he was again seen for a chronic care appointment. His next chronic care appointment is scheduled for April 26, 2023 (six month period). (Madgwick Affidavit, ¶ 25).

Regarding weight gain, Mr. Cox's weight in the past 18 months has ranged from 242 pounds to 261 pounds, and as of October 28, 2022 was reported at 250 pounds. (Madgwick Affidavit, ¶ 26).

Mr. Cox is checked on, per policy, five times a week by behavioral health staff. He has not been diagnosed with depression. (Madgwick Affidavit, ¶ 27).

## WITNESS STATEMENTS

**Secretary's Designee and Interstate Compact Administrator Darcie Holthaus**

As detailed thoroughly above, the Secretary's Designee and Interstate Compact Administrator Darcie Holthaus identified seven grievances relevant to Plaintiff's Complaint. (Holthaus Declaration, attached hereto as Exhibit 6, ¶ 5). Holthaus stated that Plaintiff has not submitted a grievance to the Secretary of Corrections concerning cell size or "double bunking." (Exhibit 6, ¶ 6). Holthaus stated that she is the Compact Administrator for the State of Kansas and has been unable to secure an out-of-state transfer for Plaintiff due to his affiliations/issues with STG's. (Exhibit 6, ¶¶ 7-12).

### Restricted Housing Administrator David Lewis

David Lewis, Restricted Housing Administrator, stated Plaintiff has been in and out of the restricted housing unit (RHU) while housed at EDCF due to concerns for his safety. (Lewis Declaration, attached hereto as Exhibit 7, ¶ 4). Plaintiff was twice released to general population but was attacked shortly after both times by rival STG members. (Exhibit 7, ¶¶ 6-7). Lewis stated that plaintiff remained Special Management with a max custody until November 22, 2022 with HCF and LCF being the only facilities he could be transferred to based on his custody level. (Exhibit 7, ¶ 8). Plaintiff refused to live at HCF and he could not return to LCF due to STG issues. *Id*. On November 22, 2022, Resident Cox's custody reduced to low medium, but on November 25, 2022, he received a disciplinary report for Less Dangerous Contraband which moved him back to max custody. (Exhibit 7, ¶ 9).

Lewis advised that Plaintiff has spent most of his time in the RHU in Holdover Status but has recently been reclassified as being in Protective Custody Status. (Exhibit 7, ¶¶ 10, 20). Plaintiff was on Holdover Status longer than usual because of his STG issues. (Exhibit 7, ¶ 12). The only Kansas prisons he could safely return to general population in he does not qualify for because of his max custody status. *Id*.

Lewis advised that Holdover Status is generally used when the Department needs to house a resident away from general population but plans to transfer the resident to a different facility or out of state in the very near future. (Exhibit 7, ¶ 11). Since residents in Holdover Status are usually not management problems or in trouble, this status is used until a transfer can be accomplished because residents in this status are afforded more privileges than some other classifications in RHU. *Id*.

Lewis stated that the RHU yard times in 2020 were regularly scheduled, 5 days per week, until the COVID 19 pandemic hit. (Exhibit 7, ¶ 14). At that time, the facility implemented a reduced movement plan to reduce the spread of COVID 19. *Id*. Sometime in mid-2021 those restrictions were lifted. *Id*. Then, sometime in October 2021, the facility again went to a reduced movement schedule due to emergency staffing levels. (Exhibit 7, ¶ 15). In May 2022, EDCF's staffing levels increased to a sufficient level to begin offering exercise yard on a reduced basis. (Exhibit 7, ¶ 16).

Lewis stated that currently, each cell block in the RHU is offered outside yard time at least once per week for at least one hour, and inside yard time at least once per week for at least one hour. (Exhibit 7, ¶ 17). Currently, these rotations occur on Mondays and Wednesdays. *Id*. During periods of restricted facility movement, residents are still allowed out of their cells to shower at least three days per week. (Exhibit 7, ¶ 18). Residents housed in RHU are also provided in cell exercise packets to assist them in remaining physically active. *Id*.

Lewis testified that from at least October 23, 2022, to the present, Plaintif has been offered yard exercise time twice per week but has refused to attend on all but one occasion. (Exhibit 7, ¶ 19).

**Special Agent Brett Sissell**

Special Agent Brett Sissell stated that in May 2020, Plaintiff (a suspected Sureno), was talking to another resident and was hit in the head from behind in E1 Cellhouse at the officer's station. (Sissell Declaration, attached hereto as Exhibit 8, ¶ 6). Plaintiff was moved back to the RHU immediately after the incident for his own safety, and for the safety and security of the EDCF. *Id*.

Sissell stated that on August 3, 2021, Plaintiff was again released to general population. (Exhibit 8, ¶ 7). Within an hour after returning to general population, Plaintiff was attacked in the E Cellhouse dayroom by members of a STG. (Exhibit 8, ¶ 7). As before, Resident Cox was immediately placed back into the RHU for his own safety, and for the safety and security of the EDCF. *Id*.

Sissell stated that based on the two prior STG related attacks and prior affiliation, Resident Cox should not be housed in general population at any max facility at this time. (Exhibit 8, ¶ 8). Specifically, Resident Cox indicated that he had distanced himself from Surenos. *Id*. Sissell stated that if a resident associates with the Surenos and later chooses to distance themselves, there is concern that other Surenos would attack that individual. *Id*.

Sissell testified that HCF, LCF, and EDCF have all had multiple Nortenos or Surenos in their general population, which would have caused concern for the safety of Resident Cox in those general populations. (Exhibit 8, ¶ 9).

**Deputy Warden of Operations Matthew Moore**

Deputy Warden Matthew Moore testified that in the past several years, the EDCF has had to implement reduced movement schedules on a few different occasions. (Moore Declaration, attached hereto as Exhibit 9, ¶ 4).

Moore stated that in April of 2020, the facility initiated partial lock-down status to help contain the spread of the Covid 19 virus. (Exhibit 9, ¶ 5). At that time, all residents remained in their cells except for being let out for showers at least 3 days per week. *Id*. The facility moved normal day-to-day programming and activities into the individual cellhouses as much as possible. *Id*. Moore stated that on October 4, 2021, EDCF again went to a reduced movement schedule due to emergency staffing levels. (Exhibit 9, ¶ 6). By early May 2022, EDCF's staffing levels increased

12

to a sufficient level to begin offering the exercise yard on a reduced basis. (Exhibit 9, ¶ 7). On May 9, 2022, the exercise yard schedule was resumed on a modified basis. *Id*. All residents are offered at least two days of exercise yard time per week. (Exhibit 9, ¶ 8).

## CONCLUSION

Plaintiff alleges that, while housed at the EDCF, he has been placed on Holdover Status for an extended period of time, during which he has been denied out-of-cell exercise, resulting in DVT blood clots. Plaintiff remained on Holdover Status due to STG concerns, as evidenced by repeated altercations/assaults occurring immediately upon his release from restricted housing, and efforts to transfer him have proven difficult based on STG affiliation/issues. Plaintiff has since been moved to Protective Custody Status. The facility has been on reduced movement a few times over the past several years due to the Covid 19 pandemic and emergency staffing levels, but once reinstated Plaintiff has refused to attend the exercise yard when offered. He has suffered from blood clots, but medical records indicate that he has some family history and that he has on occasion refused to take prescribed medications to treat/prevent blood clots, at one time stating that he was doing so to "make KDOC take note." Plaintiff's medical records do not indicate that his status in restrictive housing is the cause of his blood clots, which have been treated and resolved by medical staff.

Respectfully submitted,

*/s/ Natasha M. Carter*
Natasha M. Carter, KS No. 26074
Chief Legal Counsel
Kansas Department of Corrections
714 SW Jackson St, Suite 300
Topeka, KS 66603
Tel: (785) 506-7615
Email: Natasha.carter@ks.gov

**EXHIBIT LIST**

1. KASPER Profile for Nicholas Cox

2. IMPP 20-104A Segregation/Restrictive Housing: Purpose of Administrative Restrictive Housing and Appropriate Placements

3. IMPP 20-101A Segregation/Restrictive Housing: Minimum Standards for the Operation of Restrictive Housing Units

4. Pertinent Medical and Behavioral Health Records of Nicholas Cox

5. *Martinez* Affidavit of Sarah Madgwick, LCMFT CCHP

6. Declaration of Darcie Holthaus

7. Declaration of David Lewis

8. Declaration of Brett Sissell

9. Declaration of Matthew Moore

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the above and foregoing REPORT IN "MARTINEZ VS AARON" INVESTIGATION was placed in the US mail this 17th day of January 2023, to:

Nicholas Cox, #98253
El Dorado Correctional Facility
El Dorado, KS 67042
Plaintiff *pro se*

                                     /s/ Natasha M. Carter
                                     Natasha M. Carter