## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**NICHOLAS COX,**

      **Plaintiff,**

      **v.**                        **CASE NO.  22-3154-JWL**

**JEFF ZMUDA, et al.,**

      **Defendants.**

### MEMORANDUM AND ORDER TO SHOW CAUSE

Plaintiff Nicholas Cox is hereby required to show good cause, in writing to the undersigned, why his claims in Count II of his Second Amended Complaint should not be dismissed due to the deficiencies that are discussed herein.  The Court finds that Plaintiff's claims in Count I survive screening.

## I.  Nature of the Matter before the Court

Plaintiff brings this pro se civil rights case under 42 U.S.C. § 1983.  Plaintiff is incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF").  Plaintiff has paid the filing fee.  On August 24, 2022, the Court entered a Memorandum and Order to Show Cause (Doc. 7) ("MOSC") granting Plaintiff an opportunity to show good cause why his Amended Complaint should not be dismissed or to file a second amended complaint to cure the deficiencies set forth in the MOSC.  Plaintiff filed a Second Amended Complaint (Doc. 11) ("SAC").

The Court screened Plaintiff's SAC and ordered the officials responsible for the operation of EDCF to prepare a *Martinez* Report. (Docs. 12, 13); *see Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). The *Martinez* Report was filed (Docs. 34–43) (the "Report"), and the Court entered an order (Doc. 45) granting Plaintiff an opportunity to respond to the Report.  Plaintiff

filed a response (Doc. 47), and then moved the Court to allow him to file an additional response.[1]
The Court granted Plaintiff until March 21, 2023, in which to file an additional response to the
Report.  Plaintiff did not submit an additional response by the Court's deadline.  However, the
Court entered an Order (Doc. 50) directing the Kansas Department of Corrections ("KDOC") to
supplement the Report to clarify a discrepancy.  The KDOC filed a response (Doc. 51), and
Plaintiff filed a reply and affidavit (Docs. 53, 54).

The Court's order directing the EDCF officials to prepare the Report provides that
"[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28
U.S.C. § 1915A."  (Doc. 12, at 2.)  This matter is now before the Court for screening Plaintiff's
SAC.  The Court's screening standards are set forth in the Court's MOSC.

As Count I, Plaintiff alleges cruel and unusual punishment for the denial of out-of-cell
exercise.  (Doc. 11, at 2.)  Plaintiff alleges that Jeff Butler and Tommy Williams did not allow
segregation inmates yard for periods of at least nine months straight when they were the wardens
of EDCF.  *Id.*   Plaintiff alleges that in May 2020 he was released to general population at EDCF
after spending a year in segregation on other security risk ("OSR") status.  *Id.* at 3.  Plaintiff
alleges that he was immediately attacked by another inmate.  *Id.*  Plaintiff was told it wasn't safe
to house him there and he was placed on Holdover Transfer Status.  *Id.*

Plaintiff alleges that he spent the next sixteen months on Holdover Status, and due to the
28 months in segregation without steady yard, he developed a huge blood clot.  *Id.*  Plaintiff
alleges that he was working with Topeka and the deputy wardens the entire time to procure a
transfer, but his only option was to sit in segregation or to try general population at EDCF again.
*Id.*  Plaintiff alleges that because he was not being allowed yard or exercise in segregation, he

---

[1] The Court has considered Plaintiff's allegations in his motion at Doc. 48.

took his chances and went to general population.  *Id*.  Plaintiff alleges that he was attacked immediately and has been in Holdover Transfer Status since that time.  *Id*.

Plaintiff alleges that he has been in segregation for over 1200 days, with 880 of those days being in Holdover Transfer Status.  *Id*.  Plaintiff alleges that during his 800 days on Holdover Transfer Status the denial of exercise has been "off and on throughout the 800 days." *Id*.  He claims it has "varied from no yard from around August 2021 to May 2022, to partial yard right now which is only one day a week."  *Id*.  Plaintiff alleges that it was understandable during Covid, but they were told that the denial of yard from August 2021 to May 2022 was due to staffing.  *Id*.  Plaintiff alleges that it was horrible being double-bunked in a closet-sized cell with no out-of-cell time except for three showers each week.  *Id*.  Plaintiff alleges that the lack of out-of-cell exercise caused him to suffer from depression, weight gain, and DVT blood clots.  *Id*. Plaintiff alleges that his blood clots are "present to this day and feel as if they are worsening." *Id*.

Plaintiff alleges that Jeff Zmuda allowed EDCF to operate under-staffed when he knew or should have known that the inmates' constitutional needs were not being met, including denying hundreds of inmates any out-of-cell exercise for over nine months, knowing this would adversely affect the inmates' health.  *Id*.  He claims that Tommy Williams and Jeff Butler decided to eliminate yard for at least nine months straight even though they knew or should have known this would adversely affect Plaintiff's and other inmates' health.  *Id*.

As Count II, Plaintiff alleges the denial of equal protection "for keeping [him] in segregation for 2 1/2 years on Holdover Status when it is contrary to KDOC policy for Holdover Prisoners."  *Id*. at 2.  Plaintiff cites KDOC's Internal Management Policy and Procedure ("IMPP") 20-104A, which provides that a resident is not to be held on holdover status longer

than 15 days to accomplish the transfer to another facility. *Id.* Plaintiff alleges that the length of time he has spent on Holdover Status is not that of a typical Holdover Status inmate, and the denial of yard is a significant and atypical hardship compared to a typical Holdover Status inmate. *Id.* at 4.

Plaintiff alleges that the Defendants are in charge of making sure policy is followed at EDCF, and they have failed to make sure Plaintiff was treated in accordance with the Holdover policy. *Id.* Plaintiff alleges that Defendants could have transferred him out-of-state in May 2020, but they did not submit him for Interstate Compact transfer until February 2022. *Id.* Plaintiff claims it was unreasonable to wait 21 months. Plaintiff alleges that Defendants failed to comply with IMPP 20-101A regarding out-of-cell exercise for inmates in disciplinary or administrative restrictive housing. *Id.* Plaintiff argues that IMPP 20-101A provides that each resident confined in restrictive housing is to be allowed to exercise outside the cell for at least one hour per day and at least five days per week, unless circumstances such as emergency or extreme weather make such exercise periods impractical or dangerous. *Id.* Plaintiff further cites a provision of the IMPP stating that Restrictive Housing residents are to be permitted to exercise outdoors, weather permitting, for four of the five days, to the extent that facilities and staff are available to maintain basic security for those residents. *Id.* Plaintiff asserts that Holdover inmates are normally provided yard in accordance with the policy, but he was not. *Id.*

Plaintiff names as defendants:  Jeff Zmuda, Secretary of Corrections; Jeff Butler, former warden of EDCF; and Tommy Williams, EDCF Warden.  Plaintiff seeks $75,000 in compensatory damages, punitive damages, and a transfer to general population in a medium facility.[2]  (Doc. 11, at 6.)

---

[2]  In his response, Plaintiff indicates that he would settle for non-monetary relief in the form of restoration of good time credits and a transfer to a medium security facility.  (Doc. 53, at 2.)

## II.  The Martinez Report

The Report provides that Plaintiff's current incarceration began on June 24, 2014, at EDCF. (Doc. 34, at 3; Exhibit 1, p. 1). Between August 25, 2014, and April 4, 2019, he was transferred to Hutchinson Correctional Facility, Lansing Correctional Facility, and Larned Correctional Mental Health Facility, before returning to EDCF, where he continued to be housed at the time the Report was prepared. *Id*.

The Report shows that Plaintiff reported a family history of blood clots, and received medical care for his blood clots from February 3, 2021, through February 15, 2022, including: examinations by medical providers; an ultrasound; lab work; a 60-day prescription for Xarelto; a follow-up ultrasound at the close of his 60-day Xarelto medication; initiation of an aspirin regime; restarting on a 30-day prescription for Xarelto; an additional 30-day renewal prescription for Xarelto; an increase in his Xarelto dosage; an appointment with a cardiologist specialist; and instructions on exercises to utilize in his cell. *Id*. at 5–7; Exhibit 5 (Affidavit of Sarah Madgwick), at ¶¶ 8–17.  On February 15, 2022, Plaintiff's ultrasound follow-up returned negative for any clots. *Id*. at 7; Exhibit 5, at ¶ 19.  On February 21, 2022, Plaintiff refused the cardiology follow-up because he believed it was holding up his transfer to another facility.  His anticoagulants were also stopped at this time. On February 23, 2022, Plaintiff also refused a lab draw of blood. *Id*. at 8 (Madgwick Affidavit, ¶ 19).

On March 21, 2022, Plaintiff again reported pain in his right lower leg; the nursing staff referred him to see a provider. The next day, Plaintiff was seen by a provider who instructed him on increasing movement as possible. *Id*. at 8; Exhibit 5, at ¶ 20.

On July 7, 2022, Plaintiff reported that his blood clot was back. *Id*.; Exhibit 5, at ¶ 21. Upon evaluation by a nurse, he was scheduled for urgent/emergent sick call with a provider, who

he saw the same day.  *Id*.  That provider ordered injections of Lovenox for three days (six times total, once every 12 hours), an anticoagulant that helps prevent blood clots.  *Id*. Plaintiff was then taken to Susan B. Anthony Memorial Hospital for an emergent ultrasound. After this course of Lovenox, oral Xarelto was restarted.  *Id*.

On July 19, 2022, Plaintiff refused a chronic care appointment. On July 20, 2022, Plaintiff refused a re-draw of a lab sample, which was needed due to the previous sample having been out of stability upon delivery to the lab. Plaintiff continued to refuse other treatment, including: an ultrasound on July 25, 2022; a lab draw on August 11, 2022; nurse sick calls on August 14, 2022 and September 5, 2022; and a doctor sick call on October 14, 2022, despite stating that he wanted to speak to a provider about stopping his medication.  *Id*.  On August 23, 2022, Plaintiff requested and was placed on a cardiac diet.  *Id*.; Exhibit 5, at ¶ 22.

On October 18, 2022, Plaintiff affirmed that he stopped taking his Xarelto but reported that his "clots got hot and painful." *Id*. (Madgwick Affidavit, ¶ 23).  On October 19, 2022, Plaintiff was seen by a provider and a handheld ultrasound revealed no evidence of blood clots. *Id*. at 9; Exhibit 5, at ¶ 24. Plaintiff was again educated about exercises to stretch leg muscles and engage in movement in his cell, and he agreed to resume Xarelto.  *Id*.

On October 28, 2022, Plaintiff was seen by a provider for a chronic care appointment. On November 17, 2022, he was again seen for a chronic care appointment. His next chronic care appointment was scheduled for April 26, 2023 (six month period).  *Id*.; Exhibit 5, at ¶ 25.

Regarding weight gain, Plaintiff's weight in the past 18 months has ranged from 242 pounds to 261 pounds, and as of October 28, 2022 was reported at 250 pounds. *Id*.; Exhibit 5, at ¶ 26.  Plaintiff is checked on, per policy, five times a week by behavioral health staff. He has not been diagnosed with depression. *Id*.; Exhibit 5, at ¶ 27.

The Report provides that Darcie Holthaus, the Secretary's Designee and Interstate Compact Administrator for the State of Kansas, has been unable to secure an out-of-state transfer for Plaintiff due to his affiliations/issues with Security Threat Groups ("STG"). *Id*. at 9; Exhibit 6 (Declaration of Darcie Holthaus), at ¶¶ 7–12. Holthaus declares that sometime in March 2022 she was asked to initiate contacts pursuant to the Interstate Compact to send Plaintiff out of state. Exhibit 6, at ¶ 8. She declares that, to her knowledge, Plaintiff has STG issues that preclude him from placement in general population in KDOC facilities. *Id*. As part of the transfer process, she tries to inform the state to which the resident is being transferred of the issues that the resident has had while in KDOC custody so that they have the information for classification purposes. *Id*. at ¶ 9. Holthaus declares that she sent Plaintiff's paperwork to multiple states and never received a response, which typically means the receiving state is not interested. *Id*. at ¶ 10. She also states that she "called a few states to see if they would consider accepting the request and was told not to even send the paperwork as he would be denied due to his STG issues." *Id*. at ¶ 11. Holthaus declares that as of January 12, 2023, no state has agreed to take Plaintiff under the Interstate Compact. *Id*. at ¶ 12.

The Report provides that Plaintiff has been in and out of the restricted housing unit ("RHU") while housed at EDCF due to concerns for his safety. Doc. 34, at 10; Exhibit 7 (Declaration of David Lewis, KDOC RHU Administrator at EDCF), at ¶ 4. Plaintiff was released from the RHU to general population on May 20, 2020, but was attacked within an hour of being released and was sent back to the RHU on Holdover Status pending a transfer. *Id*.; Exhibit 7, at ¶ 6. On August 3, 2021, Plaintiff was again released to general population at his and his family's request after signing a Protective Custody Waiver, but was attacked within an hour and placed back in RHU in Holdover Status pending a transfer. *Id*.; Exhibit 7, at ¶ 7.

Plaintiff remained Special Management with a max custody until November 22, 2022, with HCF and LCF being the only facilities he could be transferred to based on his custody level.  *Id*.; Exhibit 7, at ¶ 8.  Plaintiff refused to live at HCF and he could not return to LCF due to STG issues. *Id*.

The Report provides that Plaintiff has spent most of his time at EDCF in the RHU in Holdover Status.  *Id*. at 10; Exhibit 7, ¶ 10.  Plaintiff has recently been reclassified as being in Protective Custody Status because of the inability to find a transfer location for him. *Id*. at 10; Exhibit 7, ¶ 20.  Plaintiff was on Holdover Status longer than usual because of his STG issues. *Id*.; Exhibit 7, ¶ 12.

Holdover Status is generally used when the Department needs to house a resident away from general population but plans to transfer the resident to a different facility or out of state in the very near future. *Id*.; Exhibit 7, ¶ 11.  Since residents in Holdover Status are usually not management problems or in trouble, this status is used until a transfer can be accomplished because residents in this status are afforded more privileges than some other classifications in RHU.  *Id*.

The RHU yard times in 2020 were regularly scheduled, 5 days per week, until the COVID 19 pandemic hit. *Id*. at 11; Exhibit 7, ¶ 14. At that time, the facility implemented a reduced movement plan to reduce the spread of COVID 19.  *Id*.  Sometime in mid-2021 those restrictions were lifted. *Id*. Then, sometime in October 2021, the facility again went to a reduced movement schedule due to emergency staffing levels. *Id*.; Exhibit 7, ¶ 15.  In May 2022, EDCF's staffing levels increased to a sufficient level to begin offering exercise yard on a reduced basis. *Id*.; Exhibit 7, ¶ 16.

Currently, each cell block in the RHU is offered outside yard time at least once per week

for at least one hour, and inside yard time at least once per week for at least one hour. *Id.*; Exhibit 7, ¶ 17. Currently, these rotations occur on Mondays and Wednesdays. *Id.* During periods of restricted facility movement, residents are still allowed out of their cells to shower at least three days per week. *Id.*; Exhibit 7, ¶ 18. Residents housed in RHU are also provided in cell exercise packets to assist them in remaining physically active. *Id.* From at least October 23, 2022, to the present, Plaintiff has been offered yard exercise time twice per week but has refused to attend on all but one occasion. *Id.*; Exhibit 7, ¶ 19.

The Report provides that in May 2020, Plaintiff (a suspected Sureno), was talking to another resident and was hit in the head from behind in E1 Cellhouse at the officer's station. *Id.*; Exhibit 8 (Declaration of Special Agent Brett Sissell), at ¶¶ 3, 6. Plaintiff was moved back to the RHU immediately after the incident for his own safety, and for the safety and security of the EDCF. *Id.*

On August 3, 2021, Plaintiff was again released to general population. *Id.* at 12; Exhibit 8, ¶ 7. Within an hour after returning to general population, Plaintiff was attacked in the E Cellhouse dayroom by members of a STG. *Id.*; Exhibit 8, ¶ 7. As before, Plaintiff was immediately placed back into the RHU for his own safety, and for the safety and security of the EDCF. *Id.*

The Report provides that based on the two prior STG related attacks and prior affiliation, Plaintiff should not be housed in general population at any max facility at this time. *Id.*; Exhibit 8, ¶ 8. Specifically, Plaintiff indicated that he had distanced himself from Surenos. *Id.* The Report provides that if a resident associates with the Surenos and later chooses to distance themselves, there is concern that other Surenos would attack that individual. *Id.*

The Report provides that HCF, LCF, and EDCF have all had multiple Nortenos or

Surenos in their general population, which would have caused concern for the safety of Plaintiff in those general populations. *Id*.; Exhibit 8, ¶ 9.

In the past several years, EDCF has had to implement reduced movement schedules on a few different occasions. *Id*.; Exhibit 9 (Declaration of Matthew Moore, EDCF Deputy Warden), at ¶ 4. In April of 2020, the facility initiated partial lock-down status to help contain the spread of the Covid 19 virus. *Id*.; Exhibit 9, ¶ 5. At that time, all residents remained in their cells except for being let out for showers at least 3 days per week. *Id*. The facility moved normal day-to-day programming and activities into the individual cellhouses as much as possible. *Id*. On October 4, 2021, EDCF again went to a reduced movement schedule due to emergency staffing levels. *Id*.; Exhibit 9, ¶ 6. By early May 2022, EDCF's staffing levels increased to a sufficient level to begin offering the exercise yard on a reduced basis. *Id*. at 12–13; Exhibit 9, ¶ 7. On May 9, 2022, the exercise yard schedule was resumed on a modified basis. *Id*. at 13; Exhibit 9, ¶ 7. All residents are offered at least two days of exercise yard time per week. *Id*.; Exhibit 9, ¶ 8.

The Report was supplemented to provide that Plaintiff's current custody level is low-medium. (Doc. 51, at 2, 5.) The change in custody level was uploaded into the KDOC's disciplinary system just after the Report was filed. *Id*. Despite this custody level, the supplement to the Report provides that Plaintiff remains unable to be transferred to general population within the KDOC at this time due to the presence of Surenos and/or Nortenos on the yards of the medium custody facilities. *Id*.

### III. Plaintiff's Response to the Report

In his response, Plaintiff states that he is not, and never has been, a member of the Surenos gang. (Doc. 47–1, at 1; Doc. 53, at 2.) Plaintiff states than an inmate with gang ties or

influence could have spread a rumor because they didn't want Plaintiff on the yard. (Doc. 47–1, at 2.) Plaintiff alleges that he does not need a custody override because he is medium custody, and he is willing to sign any waiver required to be transferred to Ellsworth or Norton. *Id*. at 1; Doc. 54, at 1. Plaintiff also alleges that he has never refused any medication or medical care aside from one sonogram because his cuffed arm went numb from the 40-minute wait because of a prior injury. (Doc. 47–1, at 2.) Plaintiff states that the sonogram was rescheduled and he went to the appointment. *Id*. Plaintiff states that he is not the only inmate suffering from medical and physical ailments from lack of yard. *Id*.

Plaintiff alleges that since he filed this case, EDCF has transferred the majority of their Holdover Transfer inmates (Doc. 48, at 1) and that he knows of inmates with STG issues and inmates who have killed CO's that have been accepted by states. (Doc. 47, at 2.) Plaintiff states that he has gone to outside yard every time it has been offered since November 2022. (Doc. 48, at 3.)

## IV.  DISCUSSION

### 1. Count I:  Cruel and Unusual Punishment Based on the Denial of Out-of-Cell Exercise

The Eighth Amendment requires prison and jail officials to provide humane conditions of confinement guided by "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Under the Eighth Amendment, (prison) officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (citation omitted).

A prison official violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005). The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834. Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety. *Id.* "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

This Court has found that the Tenth Circuit has identified four conclusions "on the constitutionality of denying outdoor exercise to inmates": (1) "[t]he denial of outdoor exercise could violate the Eighth Amendment under certain circumstances"; (2) "[t]he denial of outdoor exercise does not create a per se violation of the Eighth Amendment"; (3) "[r]estricting outdoor exercise to one hour per week does not violate the Eighth Amendment"; and (4) "[t]he denial of outdoor exercise for three years could arguably involve deliberate indifference to an inmate's health under the Eighth Amendment." *McDonald v. Williams*, Case No. 23-3054-JWL, 2023 WL 2784842, at *2 (D. Kan. April 5, 2023) (citing *Lowe v. Raemisch*, 864 F.3d 1205, 1208–09 (10th Cir. 2017), *cert denied*, 139 S. Ct. 5 (2018)). "In the absence of a per se violation, courts must examine the totality of the circumstances." *Id.* (citing *Apodaca v. Raemisch*, 864 F.3d 1071, 1077 (10th Cir. 2017) (citing *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 810 n.8 (10th Cir. 1999)). These circumstances include the length of the deprivation. *Apodaca*, 864 F.3d at

1077 (citing *see DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (stating that the length of time that an inmate is exposed to the conditions "is often of prime importance" under the Eighth Amendment); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (stating that the inquiry under the Eighth Amendment turns in part on the duration of the deprivation)).

The court in *Ramirez v. Knutson*, addressed a similar claim that the lack of exercise violated the Eighth Amendment. *See Ramirez v. Knutson*, 2020 WL 6834228 (W.D. Okla. 2020), *adopted by* 2020 WL 6827796 (W.D. Okla. 2020). In *Ramirez*, the plaintiff argued that during a ten-month period he only received seventy-three hours of combined inside and outside exercise time, which amounts to 1.54 hours per week. *Id.* at *1. He alleged that as a result of the lack of exercise time, he was placed on high blood pressure medication, gained weight, lost muscle mass, suffered dizzy spells and one blackout, and is now suffering stress and emotional damage based on his fears that he may have a stroke or worse. *Id.* at *2. In addressing the Eighth Amendment claim, the court found that:

> The "failure to provide inmates (confined for more than a very short period ...) with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions." *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) (quoting *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988)) (internal quotation marks omitted), *abrogated on other grounds by Lewis v. Casey*, 518 US. 343 (1996), *as recognized in Tucker v. Graves*, 107 F.3d 881 n.2 (10th Cir. 1997). To be sure, the complete or nearly complete long-term deprivation of out-of-cell or outdoor exercise is enough to state an Eighth Amendment claim. *See Fogle v. Pierson*, 435 F.3d 1252, 1260 (10th Cir. 2006) ("[W]e think it is clear that a factfinder might conclude that the risk of harm from three years of deprivation of any form of outdoor exercise was obvious....");[3] *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 809-10 (10th Cir. 1999) (holding prisoner stated an

---

[3] Later Tenth Circuit decisions question whether *Fogle* applies in determining whether a plaintiff stated a claim or to the objective standard. *See Lowe v. Raemisch*, 864 F.3d 1205, 1209 (10th Cir. 2017) ("[I]n specifically discussing the length of the deprivation [in *Fogle*], we applied the Eighth Amendment's subjective prong, not the objective prong."); *Apodaca v. Raemisch*, 864 F.3d 1071, 1079 n.5 (10th Cir. 2017) ("But *Fogle's* discussion ... was based on the standard for frivolousness and the subjective prong of the Eighth Amendment.").

Eighth Amendment claim where he alleged he "has not been permitted exercise outside his cell for over a year"); *Housley*, 41 F.3d at 599 (Plaintiff "stated a claim by alleging that he received only thirty minutes of out-of-cell exercise in three months.").

"[S]ome form of regular outdoor exercise is extremely important to the psychological and physical well-being of inmates, and some courts have held a denial of fresh air and exercise to be cruel and unusual punishment under certain circumstances." *Ajaj v. United States*, 293 F. App'x 575, 583-84 (10th Cir. 2008) (quoting *Fogle*, 435 F.3d at 1260 (quoting *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (Kennedy, J.) (collecting cases)))). But, "a denial of outdoor exercise does not per se violate the Eighth Amendment." *Apodaca*, 864 F.3d at 1077; *Ajaj*, 293 F. App'x at 584 (holding that a denial of outdoor recreation for one year for a maximum-security, administratively segregated inmate was "not sufficiently serious to implicate the Eighth Amendment").

"In the absence of a per se violation, courts must examine the totality of the circumstances ... includ[ing] the length of the deprivation." *Id.* (citations omitted); *Lowe*, 864 F.3d at 1209 ("We have said that denying outdoor exercise could violate the Constitution under some circumstances, but we have not defined those circumstances. Thus, the constitutional inquiry would depend on a case-by-case examination of the totality of circumstances.").

Claims alleging the receipt of infrequent exercise fare poorly compared to the absolute denial of exercise time. For example, in *Bailey*, the plaintiff contended he was denied exercise and fresh air, the court noted "substantial agreement ... that some form of regular outdoor exercise is extremely important to the psychological and physical well being of inmates," but held that one hour of outdoor exercise per week, while "restrictive," did not amount to an Eighth Amendment violation "without more."[] 828 F.2d at 653; *Lowe*, 864 F.3d at 1209 ("Restricting outdoor exercise to one hour per week does not violate the Eighth Amendment.") (citing *Bailey*, 828 F.2d at 653); *see also Khan v. Barela*, 808 F. App'x 602, 609-10 (10th Cir. 2020) ("[Plaintiff]'s allegation that during a three-year-plus period he was allowed outdoors to exercise only three times per week and for a maximum of 2.5 hours per week fails to show an objectively substantial risk of serious harm."); *Brooks v. Colo. Dep't of Corr.*, 2014 WL 5315000, at *8 (D. Colo. Oct. 17, 2014) ("While no precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise, it is clear from Plaintiff's allegations that he regularly participates in some exercise.") (internal quotation and citation omitted).

Defendants unhelpfully cite cases suggesting that, when compared to Plaintiff's allegations, more significant deprivations of outdoor exercise have not violated the Eighth Amendment. Doc. 44, at 6-7. Plaintiff notes that Defendant-cited cases only involved outdoor recreation and fresh air, but the plaintiffs in those cases had regular indoor recreation. Doc. 47, at 5. He also notes these cases involved inmates in restrictive housing, unlike him, a general population member with no misconducts in a medium-security facility. *Id.* The Court agrees at least in part—the maximum-security administratively segregated inmate plaintiffs in *Apodaca* received indoor exercise in a recreation room five times per week, 864 F.3d at 1074, and *Lowe* only addressed the absence of outdoor exercise. 864 F.3d at 1209-10.

These cases also did not hold the plaintiffs failed to state a claim, but instead determined that the defendants enjoyed qualified immunity because the right was not clearly established under existing Tenth Circuit law. *Apodaca*, 864 F.3d at 1074, 1079 (where prisoners were "allegedly prohibited from exercising outdoors, although they were brought to a 'recreation room' five times each week" for eleven months); *Lowe*, 864 F.3d at 1207, 1209-10 (where plaintiff "alleged deprivation of outdoor exercise for two years and one month").

*Id.* at *3–5.

The court in *Ramirez*, in granting defendants' motion to dismiss, found that the constitutional inquiry depends on a case-by-case examination of the totality of circumstances, and under the circumstances of that particular case, the plaintiff failed to allege facts sufficient to state a claim for an Eighth Amendment violation. *Id.* at *5. However, in the instant case, there is no motion to dismiss or arguments regarding qualified immunity before the Court. Therefore, at this stage of the proceedings the Court finds that Plaintiff's Eighth Amendment claim in Count I survives screening.

**2.  Count II:  Denial of Equal Protection by Keeping Plaintiff on Holdover Status Contrary to the KDOC policy for Holdover Prisoners**

Plaintiff alleges the denial of equal protection "for keeping [him] in segregation for 2 1/2 years on Holdover Status when it is contrary to KDOC policy for Holdover Prisoners."

(Doc. 11,  at 2.)  Plaintiff alleges that the length of time he has spent on Holdover Status is not that of a typical Holdover status inmate, and the denial of yard is a significant and atypical hardship compared to a typical Holdover Status inmate.  *Id*. at 4.

Liberty interests which are protected by the Due Process Clause are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).  Plaintiff does not have a constitutional right to a particular security classification or to be housed in a particular yard.  *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) (increase in security classification does not constitute an atypical and significant hardship because "a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification")).

The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005) (citing *Meachum*, 427 U.S. at 225 (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose")).  "Changing an inmate's prison classification . . . ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison." *Sawyer v. Jefferies*, 315 F. App'x 31, 34 (10th Cir. 2008) (citing *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994) (citing *Meachum*, 427 U.S. at 225)).  Plaintiff has not alleged that his assignment imposed any atypical and significant hardship

in relation to the ordinary incidents of prison life.  *Cf. Wilkinson*, 545 U.S. at 223–24 (finding atypical and significant hardship in assignment to supermax facility where all human contact prohibited, conversation not permitted, lights on 24-hours-a-day, exercise allowed for only one hour per day in small indoor room, indefinite placement with annual review, and disqualification of otherwise eligible inmate for parole consideration).

Plaintiff does not have a constitutional right to dictate where he is housed, whether it is which facility or which classification within a facility.  *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29; *Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007).  Moreover, jail officials are entitled to great deference in the internal operation and administration of the facility.  *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979). Plaintiff has failed to show an atypical and significant hardship in relation to the ordinary incidents of prison life.

Plaintiff has also failed to allege an equal protection violation.  To allege an equal protection violation, a plaintiff must state facts indicating that defendants treated him differently than other similarly situated individuals.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Plaintiff does not allege that he was treated differently on the basis of class membership. To proceed upon an equal protection claim as a "class-of-one plaintiff," there must be allegations that others similarly situated in every material respect were intentionally treated differently and that the government's action was irrational and abusive.  *Haik v. Salt Lake City Corp.*, 567 F. App'x 621, 631–32 (10th Cir. 2014); *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011).

Plaintiff has not shown that he was treated differently than similarly situated inmates.[4]
Plaintiff remained on Holdover Status due to STG concerns, as evidenced by repeated
altercations/assaults occurring immediately upon his release from restricted housing,[5] and the
Report provides that efforts to transfer him have proven difficult based on the alleged STG
affiliation/issues. Plaintiff has since been moved to Protective Custody Status. Plaintiff has not
alleged that other inmates on Holdover Status faced the same obstacles to transfer. *See Jordan v.
Federal Bureau of Prisons*, 191 F. App'x 639, 649 (10th Cir. 2006) (unpublished) (where
plaintiff argued that other inmates similarly situated to him remained in general population while
plaintiff was housed in administrative detention, the court found that plaintiff "provided no
actual examples of any of the inmates to whom he refers").

Plaintiff's argument that the KDOC violated its own policies does not save his claim.
The violation of a prison regulation does not state a constitutional violation unless the prison
official's conduct "failed to conform to the constitutional standard." *Porro v. Barnes*, 624 F.3d
1322, 1329 (10th Cir. 2010) (internal quotation marks omitted) (holding prisoner must establish
that violation of a prison policy necessarily stated a constitutional violation).   As the Tenth
Circuit has stated:

> [N]o reasonable jurist could conclude that [a plaintiff's] claim that
> prison officials deprived him of due process by violating internal
> prison regulations rises to the level of a due process violation.
> Prison regulations are "primarily designed to guide correctional
> officials in the administration of a prison [They are] not designed
> to confer rights on inmates…." *Sandin v. Conner*, 515 U.S. 472,
> 481-82, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

---

[4]  Although Plaintiff argues that he was treated differently than other inmates in holdover status, in his Amended
Complaint he claimed that he told his grandmother, in reference to Holdover Transfer Status, that "there were people
in segregation for three years on that 'temporary' status.  Lots of people."  *See* Doc. 6–1, at 3.

[5]  In his Motion for Protective Order (Doc. 20), Plaintiff sought injunctive relief in the form of an order directing
EDCF staff to, among other things,  not put him "in any more situations which can cause him violence or make him
a target."  (Doc. 20, at 2.)

*Brown v. Wyoming Dept. of Corrections*, 234 F. App'x 874, 878 (10th Cir. 2007); *see also Ramirez*, 2020 WL 6834228, at *6 (finding that restrictions on recreation privileges do not constitute a protected liberty interest under the Due Process Clause and "[a]ny attempt to rely on an ODOC regulation or policy related to exercise fails").

Plaintiff acknowledges that he was placed in segregation for his protection because he was attacked by other inmates. "Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the safety of . . . inmates.'" *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted)). This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted). Plaintiff should show good cause why his claims in Count II should not be dismissed for failure to state a claim.

## V. Response Required

Plaintiff is required to show good cause why his claims in Count II of his SAC should not be dismissed for the reasons stated herein. Failure to respond by the deadline may result in dismissal of his claims in Count II without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **June 26, 2023,** in which to show good cause, in writing to the undersigned, why Plaintiff's claims in Count II of his SAC should not be dismissed for the reasons stated herein.

**IT IS FURTHER ORDERED** that Plaintiff's claims in Count I of his SAC survive screening and the Defendants shall have until **June 26, 2023,** in which to answer or otherwise respond to the claims in Count I.

**IT IS SO ORDERED**.

**Dated May 30, 2023, in Kansas City, Kansas.**

<u>S/  John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**