## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NICHOLAS COX,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case. No. 22-3154-JWL** |
| ) | |
| **JEFF ZMUDA,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ——————————————————) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants Jeff Zmuda, Jeff Butler, and Tommy Williams ("Defendants"), submit this memorandum, through Assistant Attorney General Matthew L. Shoger, in support of their motion under Fed. R. Civ. P. 12(b)(1) and (b)(6) or Fed. R. Civ. P. 56. Defendants respectfully request that this motion be granted and this action be dismissed or, in the alternative, summary judgment be granted in their favor. Defendants attach two new exhibits, outlined in the table below, and state the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Declaration of Craig A. Brewer |
| B | Declaration of Maria Bos |

### NATURE OF THE CASE

Plaintiff Nicholas Cox, an inmate currently incarcerated in restrictive housing at El Dorado Correctional Facility (EDCF), alleges that from August 2021 to May 2022, he was not allowed yard or out-of-cell exercise (Doc. 11 at 2-3; *see also id.* at 4), and that he was denied equal protection by being kept on holdover status in restrictive housing for two-and-a-half years without being transferred out of state or to another facility (Doc. 11 at 2, 4; *see also id.* at 3).

Cox filed this lawsuit on July 28, 2022 (Doc. 1), and filed his Second Amended Complaint ("Complaint") on September 9, 2022 (Doc. 11). He brings two counts, Count I, presumably under 42 U.S.C. § 1983, for "Cruel and Unusual Punishment for denial of out-of-cell exercise," and Count II for "Denial of Equal Protection for keeping [him] in segregation for 2 ½ years on Holdover Status." (Doc. 11 at 2.) Cox seeks compensatory damages of $75,000, punitive damages, and an injunction requiring "a transfer to general population in a medium facility." (Doc. 11 at 6.)

The Court has ordered Defendants to respond to Count I, but has ordered Cox to show cause why Count II should not be dismissed. (Doc. 56.) Cox responded to the Order on June 19, 2023. (Doc. 57.) Defendants now file their Motion to Dismiss or, in the alternative, for Summary Judgment with regard to Count I. (*See* Doc. 58 (setting deadline).)

Limitations on exercise were undertaken due to the COVID-19 pandemic and due to critically low staffing levels, and Cox does not allege otherwise. (Doc. 43 at ¶¶ 4-7, pgs. 3-4; Doc. 41 at ¶¶ 14-16; Doc. 11 at 3.) Cox is currently offered at least two hours of exercise yard per week, including one hour of outdoor yard and one hour of indoor yard. (Doc. 43 at ¶ 8; Doc. 41 at ¶ 17.) Outdoor yard is in an outdoor cell and indoor yard is an indoor cell, so his exercise opportunities do not vary significantly between his cell and yard. (Exhibit A at ¶¶ 8-12.) Although the outdoor cells are slightly bigger (Exhibit A at ¶¶ 9, 11), they do not enable any exercises that Cox could not perform in his cell. And despite his family history of blood clots and being diagnosed with blood clots (Doc. 39 at ¶¶ 8-10), Cox has repeatedly refused medical treatment (paid for by KDOC) and refused to take his medications, which were geared toward alleviating any issues with blood clots (Doc. 39 at ¶¶ 11, 19, 22-23; Doc. 40 at ¶ 11).

Here, Defendants are entitled to dismissal of any official capacity claims under Count I

for lack of subject-matter jurisdiction due to Eleventh Amendment immunity. Cox's requested injunctive relief is only relevant to Count II. Defendants are entitled to dismissal of Count I due to lack of personal participation by Zmuda and qualified immunity. Alternatively, Defendants are entitled to summary judgment due to failure to exhaust and qualified immunity. Or, alternatively, Defendants are entitled to dismissal or partial summary judgment on Cox's requested remedies due to lack of a physical injury for compensatory damages under the Prison Litigation Reform Act (PLRA) and lack of the requisite subjective intent for punitive damages.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. Resident Cox has been housed in restrictive housing ("RH") at the El Dorado Correctional Facility ("EDCF") since April 4, 2019, with the exception of a few days when he was released to a county jail for a court appearance and two different occasions where he was released to general population for less than an hour before returning to RH. (Doc. 41 at ¶¶ 3-7; Doc. 43 at ¶ 3.)

2. RH is also known as segregation. (Exhibit A at ¶ 2.)

3. The phrase "Special Management" generally refers to RH. It can also refer to a crisis-level placement, such as when an inmate poses a heightened risk of self-harm. (Exhibit A at ¶ 7.)

4. RH units at EDCF limit interactions of RH residents with other individuals primarily to prevent violence and contraband. (Exhibit A at ¶ 6.)

5. Cox is a suspected member of the Surenos gang, a Security Threat Group ("STG"). (Doc. 42 at ¶ 3; *see also* Doc. 40 at ¶ 8.)

6. Cox has been housed in RH at EDCF due to issues related to STG's. (Doc. 42 at ¶ 5.)

7. He has been attacked by other residents on two occasions in STG-related attacks within

an hour after being released into general population. Cox was immediately returned to RH after both instances for his own safety, and for the safety and security of EDCF. (Doc. 42 at ¶¶ 6-8; Doc. 41 at ¶¶ 6-7.)

8.  Cox indicated that he had distanced himself from Surenos. If someone associates with the Surenos and later chooses to distance themselves, there is concern that other Surenos would attack that individual. (Doc. 42 at ¶ 8.)

9.  Cox is housed in RH because of the two prior STG-related attacks and his prior STG affiliation. (*See* Doc. 42 at ¶ 8.)

### *Transportation and Yard*

10. Because of the heightened risks associated with RH residents, they must be handcuffed when transported. They use enclosed showers, have enclosed yard time, and must be in their Program cells while attending any classes. (Exhibit A at ¶ 8.)

11. The RH cells are 7.6 feet by 12 feet, for a total of 91.2 square feet. (Exhibit A at ¶ 9.)

12. Indoor yard time for RH residents takes place in another indoor cell that is equipped with a pull-up bar. (Exhibit A at ¶ 10.)

13. Outdoor yard time for RH residents takes place in covered outdoor cells that are approximately 8 feet by 20 feet, for a total of 160 square feet. (Exhibit A at ¶ 11.)

14. RH residents share the indoor or outdoor yard cells with their cellmate. If the resident does not have a cellmate, they will be placed in the cell individually; however, the outdoor yard cells are adjacent to each other so the resident may communicate with other residents while outside. (Exhibit A at ¶ 12.)

### *COVID-19*

15. In the past several years, the EDCF has had to implement reduced movement schedules on a few different occasions. (Doc. 43 at ¶ 4.)

16. The RHU yard times in 2020 were regularly scheduled, 5 days per week, until the COVID-19 pandemic hit. At that time, the facility implemented a partial lock-down status through a reduced movement plan to reduce the spread of the COVID-19 virus. (Doc. 41 at ¶ 14; Doc. 43 at ¶ 5.)

17. At that time, all residents remained in their cells except for being let out for showers at least 3 days per week. The facility moved normal day-to-day programming and activities into the individual cellhouses as much as possible. (Doc. 43 at ¶ 5.)

18. Sometime in mid-2021, the movement restrictions due to COVID-19 were lifted. (Doc. 41 at ¶ 14.)

19. During periods of restricted facility movement, residents are still allowed out of their cells to shower at least three days per week. (Doc. 41 at ¶ 18.)

20. KDOC proactively provided RH residents with in-cell exercise packets to assist them in remaining physically active. These packets explained and showed with pictures how the residents could perform many kinds of exercises in their cells, including arm, shoulder, back, lower-body, core, full-body, and cardio exercises. (Doc. 41 at ¶ 18, pgs. 58-108.)

### Emergency Staffing Shortage

21. On October 4, 2021, EDCF again went to a partial lock-down status through a reduced movement schedule, this time due to emergency staffing levels. (Doc. 43 at ¶ 6, pg. 4; Doc. 41 at ¶ 15.)

22. On October 5, 2022, a Facility Operation plan was sent to EDCF staff regarding this reduced movement schedule. (Doc. 43 at ¶ 6, pgs. 3-4.)

23. At the time, "[s]ecurity staff continue[d] to perform under extraordinary circumstances, often requiring them to work an average of two 16 hour shifts per week." (Doc. 43 at 4.)

24. The "lock-down was implemented to provide support & relief to . . . security staff, as a

result of declining numbers of uniformed staff." (Doc. 43 at 4.)

25. The move was "prompted as a result of [a] continued, declining number of uniformed vacancies." It was "not due to any pending disruption" and was not "intended as a punitive for the resident population." (Doc. 43 at 4.)

26. Former warden Jeff Butler hoped the reduced movement schedule would allow EDCF "to re-allocate Security staff more evenly, and reduce the amount of mandatory overtime." He also hoped it would "ensure we have adequate staff available for emergency response." (Doc. 43 at 4.)

27. Butler requested any assistance available from KDOC's central office, including potentially supplementing EDCF's Security force with officers from Winfield. (Doc. 43 at 4.)

28. Butler expressed gratitude for the dedication exhibited by EDCF staff and pointed out that the situation was not unique to EDCF but that most communities and businesses were struggling with a declining work force. (Doc. 43 at 4.)

29. Under this schedule, due to the extreme understaffing, many aspects of EDCF were locked down. No EDCF residents had outdoor yard, the usual programming, communal dining, visitation, or the usual religious (SLC, or spiritual life center) call-outs. (Doc. 43 at 3-4); *see also* KDOC, Acronyms and Specialized Terms, 16 (SLC stands for "spiritual life center") https://www.doc.ks.gov/publications/KDOCAcronyms02.04.22.pdf.

30. Residents of A, B, and C cellhouses like Cox had no yard and only came out for showers and medical. (Doc. 43 at 3.)

31. During this timeframe, the warden of EDCF switched from Jeff Butler to Tommy Williams, the current warden of EDCF. KDOC, *Tommy Williams new warden for El*

*Dorado Correctional Facility* (last modified Feb. 22, 2022),

https://www.doc.ks.gov/tommy-williams-new-warden-for-el-dorado-correctional-facility;

KSN, *State announces new warden at El Dorado prison* (updated Feb. 22, 2022),

https://www.ksn.com/news/local/state-announces-new-warden-at-el-dorado-prison/.

32. By early May 2022, EDCF's staffing levels increased to a sufficient level to begin

offering the exercise yard on a reduced basis. On May 9, 2022, the exercise yard schedule

was resumed on a modified basis. (Doc. 43 at ¶ 7; Doc. 41 at ¶ 16.)

*Current Exercise Schedule*

33. All residents are currently offered at least two days of exercise yard time per week. (Doc.

43 at ¶ 8.)

34. Each cell block in the RHU is offered outside yard time at least once per week for at least

one hour, and inside yard time at least once per week for at least one hour. (Doc. 41 at

¶ 17.)

35. KDOC's records show that Cox has refused to go to yard on multiple occasions. (Doc. 41

at ¶ 19; pgs. 243-63.)

*Current Work Schedule*

36. Since April 2023, Cox has served as a custodian for the A2 RH cellhouse. He works

every evening outside his cell doing a variety of custodial duties. Hours vary. (Exhibit A

at ¶ 13.)

*Medical Care*

37. KDOC covers the cost for nearly all medical expenses for inmates. In order to do this,

KDOC spends tens of millions of dollars annually on medical expenses for inmates.

(Exhibit B at ¶ 3.)

38. Inmates pay only a $2 charge for sick calls. Inmates pay no charge at all for follow-up

calls. (Exhibit B at ¶ 4.)

39. In February 2021, Cox had a family history of blood clots but no noted personal history of blood clots. He was diagnosed with a blood clot, a proximal deep vein thrombosis (DVT) of the right leg, which he said started as pain a week before. He was placed on Xarelto, a blood thinning medication, to treat this condition for an initial 60-day prescription. (Doc. 39 at ¶¶ 8-10.)

40. In April 2021, a provider followed up at the close of the 60-day Xarelto medication. The provider ordered a follow-up ultrasound in June to confirm that the DVT had resolved and also started Cox on an aspirin regime. (Doc. 39 at ¶ 13.)

41. In June 2021, the scheduled follow-up ultrasound found that Cox still had "a right popliteal and infrapopliteal DVT." He was given Xarelto again for another 60 days. (Doc. 39 at ¶ 14.)

42. In August 2021, Cox told a nurse during a nurse visit that the blood clot had been around for much longer than he had previously said – over a year, in fact. A provider saw him the next day, increased the dosage of his Xarelto prescription, and recommended an outside appointment with a vascular surgeon. (Doc. 39 at ¶ 15.)

43. In September 2021, the outside consult with a vascular surgeon was approved. To help Cox be seen by a provider sooner than the vascular surgeon was available, Centurion staff rescheduled Cox with a cardiology specialist who could see him two days later. (Doc. 39 at ¶ 16.)

44. In September 2021, a cardiology specialist diagnosed Cox with "unexplained DVT," prescribed Xarelto for 12 months, and recommended considering a hypercoagulation work up. (Doc. 39 at ¶ 17.)

45. In February 2022, an ultrasound follow-up returned negative for any clots. (Doc. 39 at ¶ 19.)

46. On or about May 4, 2022, Cox submitted a grievance stating that he had not received yard for over seven months, and that it had been sporadic during the preceding three years, which he stated had caused him health problems, including a blood clot. He said he was able to beat his blood clot because he was afforded a period of a single-man cell, which allowed him to exercise without complaint – presumably by a cellmate – of temperature or hogging the floor. (Doc. 40 at ¶ 5, pgs. 22-23.)

47. On July 7, 2022, Cox reported that his blood clot was back. The same day, a provider ordered injections of Lovenox for three days (six times total, once every 12 hours), an anticoagulant that helps prevent blood clots. Cox was taken to a hospital for an emergent ultrasound. After the course of Lovenox, oral Xarelto was restarted. (Doc. 39 at ¶ 21.)

48. On October 18, 2022, Cox affirmed that he stopped taking Xarelto but reported that his "clots got hot and painful." (Doc. 39 at ¶ 23.)

49. On October 19, 2022, Cox was seen by a provider and a handheld ultrasound revealed no evidence of blood clots. He agreed to resume Xarelto. (Doc. 39 at ¶ 24.)

50. On October 26, 2022, a registered nurse responded to one of Cox's grievances recommending that he should take all of his prescribed medications because he had admitted to refusing to take his medications "to make KDOC take notice." (Doc. 40 at 11.)

51. Cox continued to have chronic care appointments through at least April 2023. (Doc. 39 at ¶ 25.)

52. Regarding weight gain, Cox's weight in the 18 months prior to mid-January 2023 ranged

from 242 to 261 pounds, and as of October 28, 2022, was reported at 250 pounds. (Doc. 39 at ¶ 26.)

53. Cox is checked on, per policy, five times a week by behavioral health staff. He has not been diagnosed with depression. (Doc. 39 at ¶ 27.)

54. On October 26, 2022, a registered nurse responded to one of Cox's grievances stating that there are no mental health reasons why he cannot be housed in restrictive housing. (Doc. 40 at 11.)

55. On numerous occasions, medical staff encouraged Cox or instructed him how to stretch, exercise, or increase movement in his cell. (Doc. 39 at ¶¶ 8, 12, 20, 24.)

56. On numerous occasions, Cox's medical record shows that he refused medical care, including nurse sick calls, a doctor sick call, a cardiology follow up, lab draws, a chronic care appointment, and an ultrasound. (Doc. 39 at ¶¶ 11, 19, 22; Sealed Doc. 44 at 24, 60, 64, 87, 101, 104, 110, 120-21, 194, 204-05, 210, 258, 393, 398, 528, 562, 571, 602, 633-34, 863, 919.)

57. Cox also refused treatment for a foot injury, self-harm on his right leg (where the blood clot was later found), and ankle swelling back in 2020 before the blood clot was even diagnosed. (Sealed Doc. 44 at 633-34, 863, 919.)

## QUESTIONS PRESENTED

I.     As a matter of law, does the Eleventh Amendment bar Cox's § 1983 claims against Defendants in their official capacities?

II.    Is Defendant Zmuda entitled to dismissal when Cox does not allege personal participation by Zmuda?

III.   Are Defendants entitled to qualified immunity because their actions – either as alleged or as revealed in the evidentiary record – did not violate clearly established

law of which reasonable state officials would have known?

IV.      Are Defendants entitled to summary judgment regarding any allegations regarding double-bunking or cell size because Cox failed to exhaust his administrative remedies for these matters under the Prison Litigation Reform Act (PLRA)?

V.      Should Cox's claims for compensatory damages be dismissed under the Prison Litigation Reform Act when he cannot show any physical injury was caused by Defendants' actions?

VI.      Should Cox's claims for punitive damages be dismissed when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his federal constitutional rights?

## ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Cox, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Id*. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018). A federal court must generally "satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

### *Standard on Motion to Dismiss for Failure to State a Claim*

On a Rule 12(b)(6) motion to dismiss, although a court must accept as true all well-

pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court need not accept as true those allegations that state only legal conclusions. *Id.* Under this standard, a plaintiff's claim must cross the line from "conceivable to plausible," and "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

### Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all

reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.
>
> *Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021)

(citation omitted). What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do

not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[1] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a § 1983 defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see also Grissom v. Roberts*, 902 F.3d 1162, 1167-68 (10th Cir. 2018) ("only if the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant . . . " (comma omitted)). At the motion to dismiss stage, courts look to the defendant's conduct as alleged in the complaint, while at the summary judgment stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens*, 516 U.S. at 309). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom*, 902 F.3d at 1167 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Simply put, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). In order to overcome the KDOC Defendants' qualified immunity, Cox must show not only that the KDOC

---

[1] Federal statutory rights enforceable under § 1983 are limited in number. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124-25 (2005) ("a few § 1983 claims are based on statutory rights"). They are not relevant in this case (and are generally not relevant to inmate cases), so the rest of this memorandum refers only to "constitutional rights" as shorthand for the full phrase "statutory or constitutional rights."

Defendants violated his federally secured rights, but also that objectively reasonable officials could not have thought the conduct constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (saying the clearly established right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (saying clearly established case law must answer the "constitutional question beyond debate"). If a plaintiff fails to satisfy either prong of the qualified immunity test, a court must grant the defendant qualified immunity. *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (citation omitted). The Supreme Court recently re-emphasized that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "This Court has repeatedly told courts not to define clearly established law at a high level of generality." *Id*.

I.   **The Eleventh Amendment bars Count I against Defendants in their official capacities.**

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to

arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As such, employees of KDOC share the state's immunity from suits against them in their official capacities. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). Because of the presumption that statutes do not abrogate this immunity, state agencies do not even count as "persons" amenable to suit under § 1983, and neither do state officials sued in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Cox requests monetary damages in the form of compensatory and punitive damages (Doc. 11 at 6), which are barred by the Eleventh Amendment as asserted against Defendants in their official capacities. He does not ask for prospective injunctive relief. Hence, his requested relief is barred by the Eleventh Amendment. Therefore, his claims against Defendants in their official capacities should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II.   <u>Defendants are entitled to dismissal of Count I for failure to state a claim due to lack of personal participation and qualified immunity.</u>

### A.   Cox fails to state the requisite personal participation of Secretary Zmuda.

"Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005). "Section 1983 does not authorize liability under a

theory of respondeat superior." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Rather, Cox must show an "affirmative link" between a defendant's actions and his alleged constitutional injury. *Schneider*, 717 F.3d at 767. To establish the affirmative link, Cox must show: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *Id.*

Here, Secretary Zmuda cannot be liable under Cox's claims because he was not personally involved in his alleged injury. Cox alleges that Zmuda "is in charge of implementing and creating policy and procedure for the Kansas Prison System" (Doc. 11 at 1), but Cox does not allege that policies or procedures caused any issues but rather that policies and procedures were *not* followed (Doc. 11 at 4). Cox alleges that Zmuda "is in charge of making sure policy and procedures are followed" (Doc. 11 at 4) and that he "allowed El Dorado to keep operating under extreme short staffing"[2] (Doc. 11 at 3). But that does not establish that Zmuda participated in any decisions to suspend yard time or ratified any such decisions. Cox instead effectively alleges *lack* of action by Zmuda. Cox does not allege that Zmuda acted at all, much less acted in a way that made him personally involved in Cox's injury, in a way that made him cause Cox's injury, or with a culpable state of mind. Therefore, Cox fails to state a claim against Zmuda because he fails to state that Zmuda personally participated in his alleged injury.

**B.  Defendants are entitled to qualified immunity because their actions did not violate clearly established law of which reasonable state officials would have known.**

Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions

---

[2] Defendants note that shutting down EDCF was clearly not a viable option and that KDOC made efforts to raise staffing levels as shown by the rise to a higher level by May 2022.

violated clearly established law, particularized to the facts of this case. Specifically, Cox has not shown any law that put Defendants on notice that limiting out-of-cell exercise for RH residents when made infeasible by understaffing violates the Eighth Amendment. Because qualified immunity applies, the Court should dismiss Count I for failure to state a claim.

"After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.* "[W]antonness does not have a fixed meaning but must be determined with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991).

Because the State's responsibility to attend to the basic needs of prisoners such as "adequate food, clothing, shelter, and medical care," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), "does not ordinarily clash with other equally important governmental responsibilities," *See Whitley*, 475 U.S. at 320, the Eighth Amendment's prohibition on cruel and unusual punishment includes an entitlement to a certain minimum standard of these basic needs while incarcerated. *See Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-05 & n.6 (1976)). Under normal circumstances, prison officials violate the Constitution when they act with "deliberate indifference" to an inmate's health or safety. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 807 (10th Cir. 1999) (citing *Seiter*, 501 U.S. at 303). "[I]n that context . . . 'deliberate indifference' would constitute wantonness." *Seiter*, 501 U.S. at 302.

Deliberate indifference has both an objective component and a subjective component.

*Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citing *Farmer*, 511 U.S. at 834). For the objective component, the plaintiff must show that a deprivation was "sufficiently serious," resulted "in the denial of the minimal civilized measure of life's necessities," and caused the plaintiff to be "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. "Although what constitutes cruel and unusual punishment under the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society,' the Constitution 'does not mandate comfortable prisons.'" *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 349 (1981). "To the contrary, jail conditions may be 'restrictive and even harsh' without violating constitutional rights." *Id.* (quoting Rhodes, 452 U.S. at 347).

"[N]o precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise." *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994), *abrogated on other grounds as recognized by Tucker v. Graves*, 107 F.3d 881 (table opinion), 1997 WL 100884, at *1 n.2 (10th Cir. Mar. 6, 1997). But "a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *Id.* (emphasis added) (quoting *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992)). And the Tenth Circuit has concluded has identified four conclusions "on the constitutionality of denying *outdoor* exercise to inmates": (1) "[t]he denial of outdoor exercise could violate the Eighth Amendment under certain circumstances"; (2) "[t]he denial of outdoor exercise does not create a per se violation of the Eighth Amendment"; (3) "[r]estricting outdoor exercise to one hour per week does not violate the Eighth Amendment"; and (4) "[t]he denial of outdoor exercise for three years could arguably involve deliberate indifference to an inmate's health under the Eighth Amendment." *McDonald v. Williams*, Case No. 23-3054-JWL, 2023 WL

2784842, at *2 (D. Kan. April 5, 2023) (emphasis added) (citing *Lowe v. Raemisch*, 864 F.3d 1205, 1208-09 (10th Cir. 2017)).

The subjective component requires showing that the prison official had a culpable state of mind. *Beauford*, 35 F.4th at 1262 (citing *Farmer*, 511 U.S. at 834). This is only met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Even if both the objective and subjective prongs are met, "a constitutionally legitimate justification" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010); *see also Housley*, 41 F.3d at 599 ("A total or near-total deprivation of exercise or recreational opportunity, *without penological justification*, violates Eighth Amendment guarantees." (emphasis added)). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'").

Here, restrictions on exercise can be divided into three relevant phases: (1) lack of out-of-cell exercise for several months due to COVID-19, (2) lack of out-of-cell exercise for several months during a staffing shortage, and (3) limited out-of-cell exercise currently. Regarding the first, Cox concedes that limitations on exercise during the COVID-19 pandemic were understandable. (Doc. 11 at 3.) Case law also supports that these limitations were justified.[3]

_____

[3] *See, e.g., United States v. Hicks*, No. 20-20024-JAR-1, 2020 WL 1528619, at *2, (D. Kan. March 31, 2020) (finding that suspending all social visitations in response to COVID-19

Regardless, Cox does not contest the limitations during that period.

Regarding the staffing shortage, the practical realities of low staffing levels can provide a legitimate justification for temporary prison procedures that would otherwise violate constitutional rights. *McRoy v. Sheahan*, 205 F. App'x 462, 463-64 (7th Cir. 2006) (finding a "legitimate security justification" for cancellation of religious services when a prison "was short-staffed and did not have the personnel to safely transport prisoners and supervise gatherings"); *Sandstrom v. Hoffer*, No. 08-3245-SAC, 2011 WL 4553067, at *4 (D. Kan. Sept. 29, 2011) (finding no constitutional violation for requiring male inmates to shower in the presence of female guards when the female guards were placed in the unit due to a staffing shortage to "serve[] the legitimate interest of maintaining an adequate staffing level").

Here, Cox does not contest that low staffing levels were the reason for not allowing out-of-cell exercise during this period. (*See* Doc. 11 at 3.) And the Complaint does not allege any facts that would support a reasonable inference that the limitation occurred for a different reason. What is more, the court can take judicial notice of the generally known fact that KDOC has been facing understaffing issues. *See, e.g.*, KDOC, *Annual Report: Fiscal Year 2022*, 4, https://www.doc.ks.gov/publications/Reports/kdoc-fy2022-annual-report (last accessed December 2, 2022) ("the current labor market and other factors are resulting in vacancies across

───────────────────────

"comports with the factors laid out in *Turner*" and "does not represent an exaggerated response to this global pandemic; it comports with the serious nature of a public health crisis"); *MacDonald v. Harold*, No. No. 6:20-cv-00931, 2022 WL 205671, at *6 (D. Or. Jan. 24, 2022) ("suspension of in-person religious services was rationally related to the legitimate goal of preventing the spread of COVID-19 and was not an unreasonable or exaggerated response"); *Burrage v. Lee Cnty.*, No. 1:20-CV-00180, 2021 WL 1343510, at *1 (N.D. Miss. Mar. 23, 2021) (finding that restricting access to visitors, including religious leaders, was constitutional because "taking such precautionary measures to prevent (and protect against) the spread of COVID-19 within [the jail] facility constitutes a legitimate penological objective").

our [KDOC] workforce that are the highest anyone can recall"), subject to judicial notice as per

Fed. R. Evid. 201 and *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir.

2007); *see also* Blaise Mesa, *The people running Kansas prisons have never seen a staffing crisis*

*this bad*, National Public Radio in Kansas City (KCUR) (Nov. 9, 2021),

https://www.kcur.org/news/2021-11-09/the-people-running-kansas-prisons-have-never-seen-a-

staffing-crisis-this-bad. In light of the significant understaffing issues faced by KDOC, a limited,

nine-month period where staffing levels could not support out-of-cell exercise is understandable

and justified.

Cox alleges that the lack of yard time violates the amount of yard time required by IMPP

20-101A. (Doc. 11 at 4.) Even if true, "a defendant's violation of a prison policy does not a

constitutional violation make." *Williams v. Miller*, 696 F. App'x 862, 869 & n.14 (10th Cir.

2017) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)). And the provisions

of that IMPP that Cox quotes also provide clear caveats on the yard time prescribed, such as

"unless circumstances such as an emergency . . . make such exercise periods impractical or

dangerous" and "to the extent that facilities and staff are available to maintain basic security for

those residents." (Doc. 11 at 4; Doc. 37 at 3.) These caveats plainly are met for emergency

measures due to extreme understaffing.

Regarding present-day procedures, the Complaint does not allege any ongoing

restrictions on out-of-cell exercise. (*See* Doc. 11.) So the Complaint does not allege a violation

with regard to present-day procedures.

Accordingly, no clearly established law would have put Defendants on notice that their

alleged actions were unlawful under these circumstances. Looking only to the conduct as alleged

in the Complaint, Defendants are entitled to qualified immunity as a matter of law. Count I

should be dismissed for failure to state a claim.

**III.**   **Alternatively, the Court should grant summary judgment to Defendants because of failure to exhaust and because the record further supports qualified immunity.**

    **A. Cox failed to exhaust his administrative remedies under the PLRA with regard to double-bunking or cell size.**

      *1. Exhaustion of administrative remedies is mandatory under the PLRA.*

The PLRA requires inmates to exhaust all available administrative remedies before bringing a § 1983 claim about prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520-21 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "An inmate properly exhausts a claim by utilizing each step the prison holds out for resolving the claim internally and by abiding 'with an agency's deadlines and other critical procedural rules.'" *Gray v. Sorrels*, No. 19-7060, 2020 WL 3120997, at *1 (10th Cir. June 12, 2020) (quoting *Woodford*, 548 U.S. at 90). "In other words, a prisoner must comply with procedural 'rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Williams v. Hill*, 422 F. App'x 682, 684 (10th Cir. 2011).

In a suit governed by the PLRA, failure to exhaust is an affirmative defense, and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). The issue of Cox's failure to exhaust his available remedies prior to filing his lawsuit must be determined before addressing the merits of his suit. *See Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010).

The KDOC Grievance Procedure for Inmates is set forth in K.A.R. § 44-15 101 *et seq.*, and applies "to a broad range of matters that directly affect the inmate, including . . .

[c]omplaints by inmates regarding policies and conditions within the jurisdiction of the facility or the department of corrections; and . . . actions by employees and inmates, and incidents occurring within the facility." K.A.R. § 44-15-101a(d). Here, Cox's § 1983 claim falls under this regulation because his complaint involves alleged conditions at EDCF or the alleged actions of KDOC or EDCF employees. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021) (citing K.A.R. § 44-15-101a(d)(1)).

An inmate must take four steps to complete the grievance process: (1) attempt an informal resolution with unit team members; (2) submit a grievance to an appropriate unit team member; (3) appeal to the warden of the facility; and (4) appeal to the secretary of corrections. *Id.*; K.A.R. 44-15-101(b), (d); 44-15-102(a)-(c).

> 2. *Cox did not complete the KDOC grievance process with regard to double-bunking or cell size prior to filing his § 1983 claim.*

In Count I, Cox complains of "being double-bunked in a closet sized cell." (Doc. 11 at 3.) But Cox has not exhausted administrative remedies with regard to the matters of double-bunking or cell size. (Doc. 40 at ¶ 6; *see also* Doc. 11 at 6 (only alleging that Cox filed grievances "asking for a transfer").) So those issues are not properly before this Court. *See* 42 U.S.C. § 1997e(a); *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) ("Under the [PLRA], a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court."). This Court should grant summary judgment in favor of the Defendants with regard to any allegations regarding double-bunking or cell size.

**B. The record further supports qualified immunity.**

The record bolsters a finding of qualified immunity. Regarding COVID-19, the Court can consider Defendants' Statement of Material Facts (DSOF) ¶¶ 15-20, which support that the emergency lock-down procedures were truly in response to the COVID-19 pandemic. Regarding

the staffing shortage, the Court can consider DSOF ¶¶ 19-32 above, which support that these emergency lock-down procedures were truly in response to a staffing emergency and were applied even-handedly and fairly to many aspects of EDCF. For both of the above periods of restriction, KDOC proactively provided Cox and other RH residents with exercise packets that explained and showed how the residents could perform many kinds of exercises in their cells, including arm, shoulder, back, lower body, core, full-body, and cardio exercises. (Doc. 41 at 58-108.) So KDOC promoted active and healthy exercise even during the periods of restriction.

Regarding limited out-of-cell exercise currently, the Court can consider DSOF ¶¶ 33-36, which show that Cox currently receives the opportunity for two hours of yard per week, one hour inside and one hour outside – in addition to out-of-cell custodial work – which is about the same if not more time for out-of-cell and outdoor exercise than the amount of time that the court in *Ramirez v. Knutson* deemed constitutionally adequate. *See Ramirez v. Knutson*, No. CIV-18-1085-SLP, 2020 WL 6834228, at *5 (W.D. Okla. Aug. 19, 2020) (finding 1.54 hours per week, including 0.91 hours of indoor exercise and 0.73 hours of outdoor exercise, to be constitutionally sufficient). These paragraphs also show that Cox has interfered with the frequency of his own out-of-cell exercise by refusing yard on multiple occasions.

Accordingly, the record supports a finding of qualified immunity. Reasonable officers would not have been on notice that the emergency measures taken due to COVID-19 and due to low staffing levels violated or currently violate the Eighth Amendment.

**IV.**   **Even if Cox states a claim that survives summary judgment, the Court should dismiss each of his requested remedies or grant partial summary judgment.[4]**

**A.   Cox's request for an injunction does not apply to Count I.**

Cox's request for an injunction only applies to Count II. It involves his location and custody classification, which are the subject-matter of Count II, not Count I. So the Court should not consider the request for injunctive relief in its consideration of Count I.

**B.   Cox is not entitled to compensatory damages under the PLRA when he cannot show physical injury.**

Under the Prison Litigation Reform Act (PLRA), Cox cannot receive damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Prison Litigation Reform Act, 42 U.S.C. § 1997e(e). Cox has not plausibly alleged or established a physical injury or the commission of a sexual act, so he cannot receive damages for mental or emotional injury in this case.

*1.   Defendants' challenged actions and any constitutional violation was not the proximate cause of Cox's blood clots.*

Because courts employ general tort principles of causation to § 1983 claims, "Defendants may be held liable only for the harm proximately or legally caused by their tortious conduct." *Valdez v. Macdonald*, 66 F.4th 796, 832 (10th Cir. 2023). Although proximate cause is ordinarily a question of fact for the jury, it becomes a question of law for a court to decide when insufficient evidence exists for a fact finder to reasonably find proximate cause. *Eisenhour v. Weber Cnty.*, 897 F.3d 1272, 1280 (10th Cir. 2018); *Neece v. I.R.S.*, 96 F.3d 460, 464 (10th Cir. 1996). Showing a causal link between a defendant's acts or omissions and a constitutionally

---

[4] Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense."

infirm condition precludes the defendant from contesting, on the basis of *a third party's actions*, whether the unconstitutional condition was the proximate cause of an injury. *Tafoya v. Salazar*, 516 F.3d 912, 922 (10th Cir. 2008) (citing *LaMarca v. Turner*, 995 F.2d 1526, 1538 (10th Cir. 2008) (citing *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982))).[5]

Here, as an initial matter, none of the facts alleged in the Complaint and none of the evidence in the record, including Cox's medical records, establish that Cox's blood clots were caused by his status in restrictive housing or the reduced movement schedule during the emergency staffing shortage. The blood clot diagnosed in February 2021 (Doc. 39 at ¶¶ 8-10), which was resolved by February 2022 (Doc. 39 at ¶ 19), began before the period of restriction corresponding to the emergency staffing shortage (which spanned from October 2021 to May 2022) and was actually *cured* during that period of restriction rather than *caused* by it.[6] It may have even begun back in 2020. (Doc. 31 at ¶ 15.) When a later blood clot arose in July 2022, this was *not* during the period of restriction as that period had been over, with yard being available, for about a month.

But, even assuming that a lack of exercise caused Cox to have blood clots, he is not precluded from exercising in his cell. And his exercise opportunities do not vary significantly between his cell and yard. For example, even at yard, RH residents do not have access to a large area or field to run around in. His cell is 7.6 feet by 12 feet, for a total of 91.2 square feet. (Exhibit A at ¶ 9.) Indoor yard time for RH residents takes place in another indoor RH cell,

---

[5] All three of these cases involve an intervening third parties' actions, not intervening actions of the plaintiff.
[6] Plaintiff said that blood clot dated back to at least the middle of 2020, and the medical record in fact shows issues in that same area of his body back in 2020 before the blood clot was even diagnosed: a foot injury, self-harm on his right leg (where the blood clot was later found), and ankle swelling. (Doc. 39 at ¶ 15); Defendants' Statement of Material Facts ¶ 57.

although it has a pullup bar. (Exhibit A at ¶¶ 8, 10.) Outdoor yard time for RH residents takes place in covered outdoor cells that are approximately 8 feet by 20 feet, for a total of 160 square feet. (Exhibit A at ¶¶ 8, 11.) Although slightly bigger, the outdoor cells do not enable any exercises that Cox could not perform in his cell.

Cox implied in a grievance that he did not exercise in his cell because he did not want to disturb his cellmate. (*See* Doc. 40 at ¶ 5, pgs. 22-23.) But RH residents also share the yard cells, whether indoor or outdoor, with their cellmate. (Exhibit A at ¶ 12.) So he would remain in the same proximity to his cellmate regardless of whether he was at yard or not. And, as argued above, Cox has not exhausted administrative remedies regarding the matter of double-bunking.

KDOC proactively provided Cox and other RH residents with exercise packets that explained and showed with pictures how the residents could perform many kinds of exercises in their cells, including arm, shoulder, back, lower body, core, full-body, and cardio exercises. (Doc. 41 at 58-108.) Medical professionals encouraged and instructed Cox on how to perform exercises in his cell. (Doc. 39 at ¶¶ 8, 12, 20, 24.) Opportunities for Cox to get out of his cell for out-of-cell exercise and fresh air may have been *mentally* or *emotionally* helpful, but Cox was not precluded in any way from exercising sufficiently in his cell to prevent any physical blood clots that may have been caused by lack of exercise. Not only was he not precluded from exercising sufficiently, but he was assisted in doing so by the exercise packets and by instruction from medical professionals.

Further, currently, Cox receives the opportunity for two hours of yard each week, one hour of outside yard and one hour of inside yard. (Doc. 43 at ¶ 8; Doc. 41 at ¶ 17.) And he leaves his cell to work as a custodian for his cellhouse every evening doing a variety of custodial duties for varying hours. (Exhibit A at ¶ 13.)

Second, the relevant blood clots in the record occurred primarily due to Cox refusing to take his medications and refusing medical treatment. Cox repeatedly refused medical treatment, including at one point stopping taking Xarelto for the express purpose "to make KDOC take notice." DSOF ¶¶ 50, 56-57. Cox refused treatment for a foot injury, self-harm on his right leg (where the blood clot was later found), and ankle swelling back in 2020 before the blood clot was even diagnosed. DSOF ¶ 57. Cox had a family history of blood clots (DSOF ¶ 39) and even after he developed blood clots himself, he refused to properly manage that condition. During periods of time when he did, including during the emergency staffing shortage, symptoms resolved. (*See* DSOF ¶ 45.) When he did not, symptoms worsened. (*See* DSOF ¶¶ 48, 50.)

Medical expenses for inmates are paid almost entirely by KDOC, with just a $2 sick call charge and no charge for follow-ups. (Exhibit B at ¶ 4.) Cox paid the $402 filing fee in this case. (*See* Docket.) So Cox did not have a financial reason for refusing medications or medical treatment.

Because yard does not change meaningfully Cox's exercise opportunities, KDOC is not the proximate cause of any lack of exercise by Cox. And because the relevant blood clots in the record occurred primarily due to Cox refusing to take his medications and refusing medical treatment, any lack of exercise caused by KDOC is not the proximate cause of any of Cox's blood clots.

### 2. *Cox's alleged depression is not a physical injury.*

Depression does not count as a physical injury for purposes of § 1997e(e). *Brown v. Saline Cnty. Jail*, 303 F. App'x 678, 684-85 (10th Cir. 2008). What is more, Cox is checked on, per policy, five times a week by behavioral health staff, and he has not been diagnosed with depression. (Doc. 39 at ¶ 27.)

*3. Cox's weight gain is not a physical injury.*

Not only are Defendants not aware of any cases finding weight gain to be a physical injury for purposes of § 1997e(e), but some cases have found weight changes *not* to be a physical injury for purposes of the statute in at least some circumstances. *See Melnick v. Williams*, No. 21-cv-01695, 2022 WL 4819091, at *11 (D. Colo. July 14, 2022) (citing *Davis v. D.C.*, 158 F.3d 1342, 443 (D.C. Cir. 1998)); *Pearson v. Welborn*, 471 F.3d 732, 744 (7th Cir. 2006). So no clear precedent establishes that weight gain is a physical injury for purposes of the statute. Alternatively, no clear precedent establishes that an inmate's weight oscillating within a range of just 19 pounds over a period of 18 months, as the record shows here (Doc. 39 at ¶ 26), is significant enough to be a physical injury for purposes of the statute.

*4. Any lack of fresh air is not a physical injury.*

While a lack of fresh air could potentially merit injunctive relief, it is not a physical injury meriting compensatory damages under § 1997e(e).

Therefore, for each of the above reasons, Cox is not entitled to compensatory damages because he has failed to allege a compensable injury.

**C. Cox is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Cox is not entitled to punitive damages against Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either "is shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew [his] actions were unconstitutional," a § 1983

plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992). Cox has not alleged or provided any evidence that any of the Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Cox's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. Therefore, as a matter of law, Cox cannot receive punitive damages.

Therefore, even if Cox states a claim that survives summary judgment, the Court should dismiss each of his requested remedies because he is not entitled to compensatory or punitive damages or grant partial summary judgment to the Defendants for the same reason.

## CONCLUSION

Cox's claims in Count I against Defendants in their official capacities should be dismissed for lack of subject-matter jurisdiction under the Eleventh Amendment. Cox's claims against Zmuda in Count I should be dismissed for failure to state a claim due to failing to allege the personal participation of Zmuda. The remaining individual capacity claims against Defendants in Count I should be dismissed for failure to state a claim due to qualified immunity because no clearly established law that put Defendants on notice that limiting out-of-cell exercise for RH residents when made infeasible by understaffing violates the Eighth Amendment. Finally, Defendants are entitled to summary judgment because Cox failed to exhaust his administrative remedies with regard to double-bunking and cell size and because the record further supports qualified immunity. Or the Court should dismiss each of Cox's requested remedies or grant summary judgment to the Defendants due to lack of a physical injury as required for compensatory damages and lack of the requisite subjective intent for punitive damages.

For these reasons, Defendants respectfully request that the Court dismiss Count I or, alternatively, grant summary judgment to Defendants on Count I.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

/s/ Matthew L. Shoger
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Natasha Carter
Kansas Department of Corrections
714 SW Jackson, Suite 300
Topeka, KS 66603
natasha.carter@ks.gov
*Attorney for Kansas Department of Corrections, Interested Party*

I also certify that a copy of the above was served by means of first-class mail, postage prepaid, addressed to:

Nicholas Cox, #98253
El Dorado Correctional Facility-Central
P.O. Box 311
El Dorado, Kansas 67042
*Plaintiff, pro se*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General