IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NICHOLAS COX,

          Plaintiff,

v.                                                  Case No. 22-3154-JWB

JEFF ZMUDA, *et al.*,

          Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motion to dismiss or, in the alternative, for summary judgment. (Doc. 59.) The motion is fully briefed and ripe for decision. (Docs. 60, 68, 70.) The motion is GRANTED for the reasons stated herein.

**I.     Standard**

The court will decide Defendants' motion as one for summary judgment. Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted

1

for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id.* To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

The court is mindful that Plaintiff appears pro se. As a pro se litigant, Plaintiff's pleadings are to be construed liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, this does not alleviate Plaintiff's burden of coming forward with evidence to support his claims as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Even pro se plaintiffs must present some "specific factual support" for their allegations. *Id.* Further, the court may not assume the role of advocate for the pro se litigant. *See Van Deelen v. City of Eudora, Kan.*, 53 F. Supp. 2d 1223, 1227 (D. Kan. 1999).

## II.   Procedural History and Facts

In accordance with this court's local rule regarding motions for summary judgment, D. Kan. Rule 56.1, Defendants provided Plaintiff with the notice regarding the rules applicable to motions for summary judgment. (Doc. 61.) This notice informed Plaintiff that Defendants' facts would be admitted if he failed to properly controvert those facts. As a result, all facts that have not been properly controverted by Plaintiff are admitted. Therefore, the following facts are either uncontroverted or viewed in a light most favorable to Plaintiff.

Plaintiff brought two claims against Defendants Jeff Zmuda (Secretary of Corrections), Jeff Butler (Former Warden of El Dorado Correctional Facility ("EDCF")), and Tommy Williams (EDCF Warden) ("Defendants").  (Doc. 56 at 1; Doc. 11 at 1; Doc. 7 at 3.)  Plaintiff's first claim alleges his Eighth Amendment rights were violated for denial of out-of-cell exercise.  (Doc. 60 at 2.)  His second claim alleges a denial of equal protection for keeping Plaintiff in restrictive housing for two and half years on Holdover Transfer Status.  *Id.*  Plaintiff brought both claims against Defendants in their official capacity and in their personal capacity under 42 U.S.C. § 1983.  (Doc. 56 at 1.)

Plaintiff's equal protection claims were dismissed on July 14, 2023, after Plaintiff's complaint was screened in accordance with 28 U.S.C. § 1915A.  (Doc. 64 at 5.)  On August 10, 2023, discovery and other pretrial proceedings were stayed, allowing Defendants to resolve threshold matters before requiring them to participate in discovery.  (Doc. 69 at 4.)  Defendants submitted a motion to dismiss or, in the alternative, a motion for summary judgment regarding Plaintiff's remaining claim.  (Doc. 59.)  In support of their motion, Defendants argue the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacity.  (Doc. 60 at 15–16.)  With respect to the claim against them in their personal capacity, Defendants assert that they are entitled to qualified immunity.  (Doc. 56 at 1.)

Plaintiff is incarcerated at EDCF.  Beginning April 4, 2019, Plaintiff resided in restrictive housing at EDCF because of his Other Security Risk Status.[1]  (Doc. 43 at ¶ 3; Doc. 41 at ¶ 3; Doc. 60 at ¶ 1; Doc. 68 at ¶ 1.)  He was released from restrictive housing into the general population in May 2020, but he was immediately attacked by another inmate.  (Doc. 41 ¶ 6.)  Plaintiff was promptly moved back to restrictive housing and placed on Holdover Transfer Status because he

---

[1] Restrictive housing is also known as segregation.  (Doc. 60 at ¶ 2; Doc. 68 at ¶ 2.)

was told it was unsafe to house him at EDCF. (Doc. 34 at 1.) On August 3, 2021, Plaintiff again attempted to enter the general population at EDCF but was immediately attacked and placed back in restrictive housing on Holdover Transfer Status. (Doc. 41 at ¶ 7.) He was on Holdover Transfer Status until the filing of this case on July 28, 2022. (*See* Doc. 34 at 2.) At the time of filing this lawsuit, Plaintiff alleged he had been in restrictive housing for over 1200 days (i.e., from April 4, 2019—July 22, 2022). (*See* Doc. 34 at 2.) Plaintiff alleges that he was denied exercise off-and-on throughout 800 of those 1200 days while he was in restrictive housing. *Id.* Plaintiff does not provide dates covering the 800-day period, only that he was on Holdover Transfer Status for those 800 days. *See id.* Based on that information, the 800-day period seems to begin in May 2020, when Plaintiff was first placed on Holdover Transfer Status, and continued to his initial filing of this lawsuit in July 2022. Certain periods where Plaintiff endured intermittent out-of-cell exercise or complete denial of out-of-cell exercise during these 800 days gave rise to Plaintiff's Eighth Amendment claim. *See id.* Under a regular schedule, residents in restrictive housing at EDCF have both indoor yard time and outdoor yard time five days per week. (Doc. 41 at ¶ 14.)

Beginning in April 2020, at the start of the COVID-19 Pandemic, EDCF reduced yard time to inhibit the spread of the coronavirus. *Id.* Kansas Department of Corrections ("KDOC") provided restrictive housing residents with hard-copy, in-cell exercise packets to assist them with remaining physically active during the COVID restricted movement period.[2] (Doc. 43 at ¶ 18.) These were provided to the residents when the coronavirus restrictions were first enacted. (Doc. 70 at 17) (citing Ex. C ¶ 18.)

---

[2] Plaintiff disputes he received the paper version of the in-cell exercise packet. (Doc. 68-1 at ¶ 6.) However, he does not offer evidence indicating that the KDOC failed to provide restricted housing residents the exercise packet. Plaintiff also offers no evidence indicating that KDOC never even attempted to provide him with a packet. (Doc. 70 at ¶ 20.)

In the middle of 2021, the COVID-19 restrictions were lifted, but in the wake of the pandemic EDCF experienced staffing shortages that resulted in a reduced movement schedule for exercise. (Doc. 41 at ¶¶ 14–15). It is undisputed that Plaintiff had no yard time from the start of the pandemic to the middle of 2021. (Doc. 60 at ¶ 17; Doc. 68 at ¶ 17.) Plaintiff has not offered evidence that he was fully restricted from yard time during the period between when the COVID restrictions were lifted until October 2021. Rather, Plaintiff's affidavit states that he was not receiving consistent yard time from the date the coronavirus restrictions were lifted until October 2021. (Doc. 68-1 at ¶ 7.) EDCF officially entered modified lock-down status in October of 2021 because of emergency short-staffing. (*See* Doc. 43 at 3–4; Doc. 41 at ¶ 15; Doc. 68-1 at ¶ 7.) When EDCF officially entered a modified emergency lock-down status for short staffing, no resident of EDCF (including restrictive housing residents) had outdoor yard time.[3] (Doc. 43 at 3–4.) Plaintiff, who was a resident of restrictive housing, had no out-of-cell exercise. (Doc. 60 at ¶ 30; Doc. 68 at ¶ 30.) Defendants reduced restrictive housing residents' out-of-cell exercise time as part of an effort to maintain security at the facility in the face of dwindling staff numbers and to ensure that sufficient security staff were available to respond to emergencies. (*See* Doc. 43 at 4.) By May 2022, EDCF's staffing levels had increased to a level that allowed them to offer restrictive housing residents yard time on a modified basis. (Doc. 41 at ¶ 16; Doc. 43 at ¶ 7.) Plaintiff alleges he was denied out-of-cell exercise from October 2021 to May 2022.[4] (Doc. 68-1 at ¶ 7.) Currently,

---

[3] Plaintiff attempts to controvert the fact that all residents at EDCF experienced no outdoor yard, communal dining, visitation, or usual religious call-outs by stating in his response (Doc. 68) that this fact is controverted. (Doc. 68 at ¶ 29.) However, he fails to proffer evidence to support his assertion that the general population at EDCF had some of the aforementioned privileges. *See id.* Therefore, he has not controverted this fact.

[4] Plaintiff alleges in his complaint that he was denied out-of-cell exercise from August 2021–May 2022. (Doc. 11 at 3.) However, his affidavit attached to his response to Defendant's motion for summary judgement states only that he was not receiving steady, consistent yard time before October 7, 2021. (Doc. 68-1 ¶ 7.)

restrictive housing residents at EDCF are offered at least two days of exercise yard time per week.[5] (Doc. 60 at ¶ 33.)

During the 800-day period giving rise to Plaintiff's Claim I, Plaintiff alleges inconsistent yard time caused him health problems. (Doc. 34 at 2.) One of these alleged health problems was a blood clot (i.e., deep vein thrombosis ("DVT")) in his right leg, with which he was diagnosed in February 2021 during the COVID-19 restrictions period. (Doc. 39 at ¶ 10.) He was prescribed the blood thinning medication Xarelto to treat the blood clot. *Id.* Plaintiff underwent two rounds of 60-day Xarelto treatment, but they did not resolve the blood clot. (*See id.* at ¶¶ 39 & 41.) In August 2021, Plaintiff saw a medical provider who increased the Xarelto dosage and recommended that Plaintiff see a specialist. (*See id.* at ¶ 15.) In September 2021, a cardiology specialist visited Plaintiff and diagnosed him with "unexplained DVT" and recommended a hypercoagulation work up. (*Id.* at ¶ 17.) The specialist prescribed Xarelto for twelve months, and in February 2022, an ultrasound indicated Plaintiff no longer had the blood clot. (*See id.* at ¶¶ 17 & 19.)

However, on July 27, 2022, Plaintiff reported his blood clot had returned, and the same day, a healthcare provider ordered injections of an anticoagulant. (*Id.* at ¶ 21.) Plaintiff then went to the hospital for an emergent ultrasound. (*See id.*) Following the prescribed course of anticoagulant injections, Plaintiff started receiving Xarelto again. (*See id.*) On October 18, 2022, Plaintiff told a nurse he had stopped taking his Xarelto. (*Id.* at ¶ 23; Doc. 60 at ¶ 50; Doc. 68 at ¶ 50.) An ultrasound on October 19 revealed no evidence of blood clots. (Doc. 39 at ¶ 25.) Plaintiff has had chronic care appointments through April 2023. (Doc. 39 at ¶ 25.)

---

[5] Plaintiff tries to controvert this fact by claiming the outdoor yard time is often cancelled for various reasons. (68-1 at ¶ 9.) However, he offers no evidence for why the outdoor yard time is being cancelled nor does he claim EDCF is cancelling the outdoor yard time for malicious reasons.

Plaintiff has also complained of weight gain because of his restricted out-of-cell exercise. (Doc. 34 at 2.) However, Plaintiff has not experienced radical weight gain since being denied out-of-cell exercise. From about the time the COVID-19 restrictions were lifted (i.e., the middle of 2021) to January 2023, his weight has ranged from 242–261 pounds. (Doc. 39 at ¶ 26.) In October 2022, Plaintiff's reported weight was 250 pounds. (*See id.*) EDCF medical staff have also encouraged Plaintiff on numerous instances to stretch, exercise, and increase his movement in his cell. (*See* Doc. 39 at ¶¶ 8, 12, 20, 24.)

**III.   Analysis**

Plaintiff claims that Defendants violated his Eighth Amendment rights by restricting Plaintiff's yard time which prevented him from having any out-of-cell exercise. (Doc. 11 at 2.) Defendants argue that the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacity such that they should be dismissed for lack of jurisdiction. (Doc. 60 at 15–16.) Defendants also move for summary judgment on Plaintiff's claims brought against them in their personal capacity under § 1983, arguing they are entitled to qualified immunity. (Doc. 56 at 1.) This court takes Defendants' arguments in turn.

   **A.  Official Capacity: Eleventh Amendment Sovereign Immunity**

The Eleventh Amendment bars citizens from suing nonconsenting states in federal court for money damages. *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019). The Supreme Court has clarified that while state officials are persons, a lawsuit against them in their official capacity is a lawsuit against the official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Moreover, a lawsuit against a state official's office is really a lawsuit against the state itself. *See id.* This court has already concluded that the KDOC is an agency or department of the State of Kansas. *See Grissom v. Bell*, No. 20-3163-JWB, 2022 WL

7

4534620, at *4 (D. Kan. Sept. 28, 2022). Accordingly, the Eleventh Amendment bars lawsuits against state officials for money damages in their official capacity when the state has not consented to the lawsuit.

In this case, Plaintiff seeks compensatory and punitive damages from Defendants, (Doc. 11 at 6), and Defendants are, or were, employees of the KDOC during the events alleged in Plaintiff's complaint. (Doc. 7 at 3.) Plaintiff has also failed to explain why the Eleventh Amendment does not bar his claims against Defendants in their official capacity. Instead, Plaintiff acknowledges that Defendants Butler and Williams were acting in their official capacities as wardens for EDCF when they implemented policies that restricted his out-of-cell exercise. (*See* Doc. 68 at 9.) As for Defendant Zmuda, Plaintiff also acknowledges that he was acting in his official capacity by overseeing the KDOC prison system when the restrictions on out-of-cell exercise were implemented. *See id.* Plaintiff also admits that he seeks money damages, not prospective injunctive relief. (Doc. 68 at 10).

Therefore, Plaintiff's Eighth Amendment Claim against Defendants in their official capacity is dismissed for lack of jurisdiction.

### B. Personal Capacity: Qualified Immunity

Plaintiff's Eighth Amendment claim is a § 1983 cause of action against Defendants. Plaintiff claims Defendants violated his Eighth Amendment rights by restricting/denying him out-of-cell exercise. (Doc. 11 at 1.) Defendants, in response, argue they are entitled to qualified immunity. (Doc. 60 at 17–22.) When a defendant claims he is entitled to qualified immunity in a § 1983 case, the defendant is presumed to be immune from the action. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). To overcome this presumption, a plaintiff bears the heavy burden of showing: (1) the defendant's conduct violated a constitutional right, and

(2) the constitutional right was clearly established at the time of the violation such that "every reasonable official would have understood" their action constituted a violation of the right. *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Plaintiff bears the burden of satisfying both elements, and Defendants will prevail if Plaintiff fails to satisfy either prong. *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). The court may go directly to the second prong as both prongs must be established. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009).

With respect to the second prong, a constitutional right is clearly established when Tenth Circuit or Supreme Court precedent is on point. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003). However, the law can be clearly established without case law directly on point when the "existing precedent . . . placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). As a result, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12. Clearly established law cannot be defined at a "high level of generality." *Id.* The "dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).

Here, Plaintiff contends that he, an inmate who is in restrictive housing, has a constitutional right to out-of-cell exercise. During the COVID-19 restrictions period, lasting from May 2020 through the middle of 2021, Plaintiff was denied exercise outside of his cell. (Doc. 60 at ¶ 17; Doc. 68 at ¶ 17.) When the restrictions were lifted in the middle of 2021, Plaintiff alleges he experienced intermittent restrictions on out-of-cell exercise because of short staffing. (Doc. 68-1

at ¶ 7.) Then from October 2021 through May 2022, Plaintiff alleges, and Defendants admit, he was denied all out-of-cell exercise due to emergency-level staffing shortages. (Doc. 60 at ¶ 30; Doc. 68 at ¶ 30.) Currently, Plaintiff has the opportunity for at least two days of out-of-cell exercise per week. (Doc. 60 at ¶ 33.)

The court concludes that Plaintiff has failed to show that he had a clearly established right to out-of-cell exercise during the COVID-19 restrictions period (i.e., May 2020 thought the middle of 2021). Plaintiff does not cite to case law indicating otherwise, and Plaintiff even alleges in his complaint that Defendants were justified in restricting his out-of-cell exercise during this period. (Doc. 11 at 3.) Indeed, it hardly appears controversial to observe that prison officials were justified in efforts to minimize the spread of COVID-19 by limiting contact between inmates during the time periods that the virus was rampaging through our communities and the prison systems. Restricting the sort of close personal contact occasioned by inmate movements and gatherings such as time in the prison yards likely seemed reasonable under the circumstances and, in any event, Plaintiff identifies no clearly established authority to the contrary.

By contrast, the court is not so quick to dismiss Plaintiff's claim on Defendants restricting out-of-cell exercise due to EDCF's understaffing in the wake of the coronavirus pandemic. Accordingly, the court's qualified immunity analysis focuses on the period when Plaintiff was intermittently denied out-of-cell exercise from the middle of 2021 through the period when he was completely denied out-of-cell exercise from October 2021 to May 2022 because of staffing shortages.

Nonetheless, after review, the court finds that Plaintiff failed to meet his burden to demonstrate his right to out-of-cell exercise was clearly established in this case given the circumstances surrounding EDCF during the time periods at issue. Plaintiff has not pointed to any

authority from the Tenth Circuit or the Supreme Court to support his position. Moreover, acknowledging Plaintiff is proceeding pro se, after a brief review of applicable precedent, there is limited authority addressing similar claims.

Although recognizing that outdoor exercise is "extremely important to the psychological and physical well-being of inmates," the Tenth Circuit has also "made clear that a denial of outdoor exercise does not per se violate the Eighth Amendment." *Apodaca v. Raemisch*, 864 F.3d 1071, 1077 (10th Cir. 2017) (quoting *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (per curiam)). In fact, in *Lowe v. Raemisch*, 864 F.3d 1205 (10th Cir. 2017), the court of appeals held that it was not clearly established that restricting an inmate's outdoor exercise for two years and one month is a violation under the Eighth Amendment. *See id.* at 1210. Without a per se rule on the constitutionality of restricting outdoor exercise, the Tenth Circuit requires a court to examine the totality of the circumstances to determine whether a restriction on outdoor exercise is a violation. *See Apodaca*, 864 F.3d at 1077. Thus, government officials who enact policies that restrict inmates' outdoor exercise are left with little to no guidance because of the lack of per se rules and the totality of circumstances analytical framework.

However, in this case, Plaintiff is not just alleging a restriction on outdoor exercise, but he is alleging that he endured periods of both intermittent out-of-cell exercise and complete denial of out-of-cell exercise. (Doc. 60 at ¶ 17; Doc. 68 at ¶ 17; Doc. 68-1 at ¶ 7; Doc. 43 at 3–4; Doc. 60 at ¶ 33.)

Generally, correctional facilities must provide inmates with some opportunity to exercise. In Eighth Amendment jurisprudence, a seminal case on inmates' right to out-of-cell exercise is *Mitchell v. Rice*, 954 F.2d 187 (4th Cir. 1992). There, the court confirmed the general rule that inmates must be afforded some out-of-cell exercise. *See id.* at 191. Citing *Mitchell*, the Tenth

11

Circuit in *Housley v. Dodson*, 41 F.3d 597 (10th Cir. 1994), a case that also involves restrictions on *out-of-cell* exercise, approved of the general rule from *Mitchell* that total denial of out-of-cell exercise for extended periods of time, "without penological justification," would violate the Eighth Amendment's prohibition on cruel and unusual punishment.  *See id.* at 599 (quoting *Mitchell*, 954 F.2d at 192).  Thereafter, in *Perkins v. Kansas Dept. of Correction*, 165 F.3d 803 (10th Cir. 1999), the Tenth Circuit considered whether deprivation of *out-of-cell* exercise for nine months violated the Eighth Amendment.  *See id.* at 806–07.  A subsequent Tenth Circuit opinion determined that *Perkins* could be read broadly or narrowly, and it was not entirely clear which view represented the actual holding of the case.  *See Apodaca*, 864 F.3d at 1078.  The broad view is that a denial of only outdoor exercise for nine months violates the Eighth Amendment.  *See id.* at 1077–78.  The narrow view is that a denial of all out-of-cell exercise for nine months, which by its logical terms is a denial of outdoor exercise as well, violates the Eighth Amendment.  *See id.* at 1078.  Although the Tenth Circuit declined to determine which view of *Perkins* is correct, *see id.*, the court reasons that, at a minimum, the narrow view of *Perkins* is not ambiguous and remains applicable to future cases involving restrictions on out-of-cell exercise.

Nevertheless, the courts in *Mitchell*, *Housely*, and *Perkins* limited the general rule that inmates must have some opportunities for out-of-cell exercise.  The court in *Mitchell* declined to adopt a per se rule that denial of out-of-cell exercise violates the Eighth Amendment.  *See* 954 F.2d at 191.  Instead, the court adopted a "totality of circumstances" analytical framework to address denial of out-of-cell exercise claims.  *See id.*  The court also held that exceptions to the general rule "may be made under exigent circumstances that necessitate constriction of these rights." *Id.* at 193.  In accord with *Mitchell's* totality of the circumstances analytical framework, the Tenth Circuit in *Housely* also determined that there is not a per se rule for determining whether

12

an inmate had an adequate opportunity for exercise, but "that what constitutes adequate exercise will depend on the circumstances of each case . . . ." *Housley*, 41 F.3d at 599. Additionally, in *Perkins*, the court relied on *Mitchell* and discussed how correctional facilities may enact restrictions on out-of-cell exercise when they arise from unusual circumstances. *See* 165 F.3d at 810 n.8. The court in *Perkins* did not disclose what unusual circumstances justify restrictions on out-of-cell exercise.

As relevant here, prison officials relying upon *Mitchell*, *Housely*, and *Perkins* would know that there is general rule that inmates must have some opportunity for exercise outside of their cell. However, officials relying on those same cases would know that whether an inmate has received adequate opportunity for out-of-cell exercise is a fact-specific, case-by-case judgement. Put differently, there is not a clear, per se rule guiding their conduct, but each alleged Eighth Amendment violation for denial out-of-cell exercise must be analyzed under the case's facts. Moreover, Defendants by relying on those three cases would also have understood that unusual circumstances may justify restricting an inmate's out-of-cell exercise. Plaintiff does not cite to case law that clearly establishes his right to out-of-cell exercise despite emergency staffing shortages for any reason, and certainly not any cases addressing such shortages arising from a stunning upset in the workforce like that occasioned by the coronavirus pandemic, nor has the court found any such case from its own research.[6]

To further obscure matters for Defendants, case law suggests correctional facilities may adopt temporary practices that violate an inmate's constitutional protections when those temporary

---

[6] The court also notes that the COVID-19 Public Health Emergency did not end until May 11, 2023, *see* U.S. Dep't of Health and Human Serv.'s, *Fact Sheet: End of the Covid-19 Public Health Emergency* (May 9, 2023), https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html. Thus, the country was still in a public health emergency long after the restrictions on Plaintiff's out-of-cell exercising abated.

practices are "required to protect government interest such as maintaining security at a correctional facility." *Sandstrum v. Hoffer*, NO. CIV.A. 08-3245-SAC, 2011 WL 4553067, at *4 (D. Kan. Sept. 29, 2011) (quoting *West v. Parker,* 68 F.3d 466 (5th Cir.1995)). In *Sandstrum*, Plaintiff's alleged Eighth Amendment violation was that he was forced to shower in the presence of female guards due to staffing shortages. *See id.* The court did not find a constitutional violation because the female guards' supervision of showers "served the legitimate interest of maintaining an adequate staffing level." *Id.* Although *Sandstrum* is factually dissimilar to Plaintiff's claim, the legal ruling indicates that correctional facilities may enact temporary restrictions that infringe on an inmate's rights when staffing shortages cause safety concerns. *See id.* Here, Defendants reduced out-of-cell exercise for a legitimate penological interest: to ensure institutional security and the safety of prisoners and staff in the face of emergency staffing shortages. (Doc. 43 at 4.)

Based on the foregoing reasons, the court concludes the Plaintiff has failed to meet his burden to show that his right to out-of-cell exercise under the circumstances of this case was clearly established at the time of the alleged violation. Accordingly, Defendants are entitled to summary judgment on the basis of qualified immunity. The court expresses no opinion on the alternative theories advanced by Defendants.

## IV. Conclusion

Defendants' motion for summary judgment (Doc. 59) is GRANTED.

IT IS SO ORDERED. Dated this 3rd day of November, 2023.

___s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
